# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BRETT F. DYER,

        *Plaintiff*,

    v.

McCORMICK AND SCHMICK'S
SEAFOOD RESTAURANTS, INC., *et al.*,

        *Defendants*.

Civil Action No. 14-1037 (RDM)

## <u>MEMORANDUM OPINION AND ORDER</u>

This employment discrimination and retaliation case is before the Court on Defendants'
motions for summary judgment (Dkts. 37 & 38). Plaintiff is Brett F. Dyer—a Sous Chef who
aspired to be an Executive Chef. Defendants are three national restaurant chains. Defendant
McCormick and Schmick's Seafood Restaurants, Inc. ("M&S") operates a variety of restaurants
across the United States. Defendant Landry's, Inc. ("Landry's") acquired M&S in January
2012.[1] And Defendant Gordon Biersch Brewery Restaurant Group, Inc. ("Gordon Biersch")
owns and operates another chain of restaurants.

Between December 2005 and May 2013, Dyer worked as a Sous Chef for M&S and then
M&S/Landry's. Although Dyer repeatedly expressed interest in becoming an Executive Chef, he
never received a promotion. Dyer says he was not promoted because of his race. M&S/Landry's
responds that (1) he was not officially considered for promotion because he never submitted an
application and (2) he was not otherwise considered because he was not qualified. Because Dyer

---

[1] In light of the acquisition, the Court will refer to M&S and Landry's collectively as
"M&S/Landry's."

has failed to adduce any material evidence casting doubt on the second of these rationales, the Court will **GRANT** M&S/Landry's motion for summary judgment as to Dyer's non-promotion claims.

Dyer's employment ended in May 2013 when M&S/Landry's shuttered the restaurant to which he was assigned. Although M&S/Landry's transferred the remaining managers to other M&S/Landry's restaurants in the region, it failed to do the same for Dyer. Instead, M&S/Landry's terminated Dyer's employment for what he alleges were unlawful discriminatory and retaliatory reasons. Because a reasonable jury could find that M&S/Landry's proffered justifications for terminating Dyer's employment were not only false but evasive, and because Dyer was let go shortly after filing an EEO complaint with the D.C. Office of Human Rights, the Court will **DENY** M&S/Landry's motion for summary judgment as to Dyer's termination claims.

Finally, in May and June of 2013, Dyer sought a position at a restaurant owned by Gordon Biersch. Gordon Biersch extended him an offer but withdrew it soon thereafter. Gordon Biersch says it withdrew the offer because it learned that Dyer had misrepresented his employment history. Dyer says that Gordon Biersch withdrew the offer because someone from M&S/Landry's sent an email to Gordon Biersch calling him a "troublemaker," purportedly in reference to his recent complaints of racial discrimination and unlawful retaliation. Dyer thus accuses M&S/Landry's of engaging in "post-termination retaliatory behavior," and accuses Gordon Biersch of withdrawing its offer because of unlawful retaliatory animus. Dyer has failed to identify any admissible evidence, however, establishing the existence, much less the specific substance, of the alleged email. Nor has he identified any evidence that would permit a reasonable jury to find that Gordon Biersch personnel were aware of Dyer's earlier

discrimination and retaliation complaints. The Court, accordingly, will **GRANT** all three defendants' motions for summary judgment as to Dyer's post-termination claims.

## I. BACKGROUND

At restaurants run by M&S (and, later, by Landry's), Sous Chefs must demonstrate not only culinary skills, but managerial skills. Dkt. 37-2 at 11 (M&S/Landry's Statement of Undisputed Material Facts ("SUMF") ¶¶ 15, 16).[2] They are responsible for food preparation, inventory management, and supervision of the kitchen's hourly staff, including line cooks. *Id.* They also "assist with kitchen staff scheduling, personnel actions, and employee paperwork." *Id.* (M&S/Landry's SUMF ¶ 15). And they have other responsibilities like ordering supplies and managing costs. *See, e.g.*, Dkt. 37-7 at 4; Dkt. 37-22 at 2. Sous Chefs are evaluated annually based on "culinary skills, quantitative metrics such as sales and budget, and qualitative manager[ial] behaviors such as business acumen, leadership, and employee relations." Dkt. 37-2 at 11 (M&S/Landry's SUMF ¶ 16).

A given M&S/Landry's restaurant will typically have multiple Sous Chefs, as well as one Executive Chef. The Executive Chef oversees the Sous Chefs and "is responsible for overall management of kitchen functions." *Id.* at 8–9 (M&S/Landry's SUMF ¶ 6); *accord id.* at 11 (M&S/Landry's SUMF ¶ 16). In addition, M&S/Landry's employs Regional Managers and Regional Chefs who oversee all M&S/Landry's restaurants in a given regional market. *Id.* at 9–

---

[2] Pursuant to Local Civil Rule 7(h)(1), the moving parties have provided statements of material facts as to which they contend there is no genuine dispute, *see* Dkt. 37-2 at 7–21; Dkt. 38-2, and Dyer has provided separate statements setting forth all material facts as to which he contends there exists a genuine dispute necessary to be litigated, *see* Dkts. 40-16 & 41-1. "In determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion." LCvR 7(h)(1). Where Dyer has not disputed defendants' statements of material fact, those facts are accordingly accepted as true for purposes of the pending motions.

10 (M&S/Landry's SUMF ¶¶ 8–9).  At the relevant times, the District of Columbia market included as many as nine M&S/Landry's restaurants.  *See, e.g.*, Dkt. 40-11 at 4.

## A. Dyer's Employment at the D.C. Grill

On December 7, 2005, Dyer began as a Sous Chef at the M&S Grill located at 600 13th Street NW, Washington, D.C.  Dkt. 37-2 at 7–8 (M&S/Landry's SUMF ¶ 3).  (For clarity, this opinion will refer to the restaurant as "the D.C. Grill.")  According to Dyer, he also filled in as the D.C. Grill's *de facto* Executive Chef for an extended period of time "around 2006," while Lisa Thompson, an African-American women who served as the actual Executive Chef, recovered from a car accident.  Dkt. 40-1 at 6–7 (Dyer Dep. 73:4–77:2, 80:14–20); Dkt. 40-2 at 3 (Dyer Dep. 100:11–12).  He asserts that, during his informal tenure in that position, the D.C. Grill rocketed up M&S's internal rankings "in the region for the whole United States," moving from sixty-eighth place to first.  *See* Dkt. 40-2 at 3 (Dyer Dep. 97:4–98:16).  Although Dyer testified that he had "paperwork to attest to [the D.C. Grill's rise in the rankings]" during his informal tenure as the *de facto* Executive Chef, *see id.* (Dyer Dep. 97:8), no such documents are before the Court.  Around the same time (*i.e.*, in 2006), Dyer recalls asking Regional Chef Anthony Marcello why he had not yet been promoted.  *Id.* (Dyer Dep. 98:21–99:4, 100:11–12).  According to Dyer, Marcello responded: "[W]hen I see an executive chef, I know it when I'm looking at him."  *Id.* (Dyer Dep. 99:16–17).  In Dyer's view, that answer "d[id]n't make any sense," given how successful he had been in his role as the D.C. Grill's *de facto* Executive Chef.  *Id.* (Dyer Dep. 99:17–100:15).

Dyer's performance reviews from 2006 to 2008, however, paint a less flattering picture of his abilities.  His first—and, ultimately, best—review took place in August 2006, about eight months after he started.  *See* Dkt. 37-7.  His average rating across all categories was 3.3 out of 5, putting him slightly above the "[m]eets [e]xpectations" benchmark of 3.0.  *See id.*  But that was

the only review in which Dyer "met expectations." In his 2006–2007 annual review, his average rating dropped to 2.8, *see* Dkt. 37-8, where it remained for his 2007–2008 review, *see* Dkt. 37-9.[3] Dyer's various reviewers expressed concerns about his "tend[ency] to forward problems to [his supervisor]," *see* Dkt. 37-8 at 2; Dkt. 37-7 at 3; his difficulties training subordinates and delegating them tasks, *see* Dkt. 37-7 at 2; Dkt. 37-8 at 4; Dkt. 37-9 at 2, 3; and his untimely and inconsistent enforcement of company policies, *see* Dkt. 37-7 at 2; Dkt. 37-8 at 2, 6; Dkt. 37-9 at 2. The 2006–2007 and 2007–2008 reviewers further emphasized Dyer's need to hew more closely to M&S recipes and food preparation techniques, and his need to keep the kitchen in cleaner condition. *See* Dkt. 37-8 at 4, 6; Dkt. 37-9 at 3, 5. They also rated many of his financial management skills as "[b]elow [e]xpectations." *See* Dkt. 37-8 at 4; Dkt. 37-9 at 3.

All the while, Dyer continued to express frustration that he had not been promoted.[4] Between April and November 2007, he had several conversations with M&S employees, including two conversations with the supervisor who completed his 2006 performance evaluation, in which he "complained . . . that . . . [he was] being passed over" because of his race

---

[3] The document M&S identifies as Dyer's 2007–2008 performance evaluation is undated and unsigned, *see* Dkt. 37-9; Dkt. 43-1 at 1, but Dyer does not dispute its authenticity, *compare* Dkt. 37-2 at 12 (M&S/Landry's SUMF ¶ 18), *with* Dkt. 40-16 at 3 (Dyer SDMF). The parties have not submitted any performance reviews regarding Dyer for the year 2008–2009.

[4] For record citations in Dyer's brief used to justify the assertion that Dyer informally expressed to M&S management his interest in being promoted, see Dkt. 40 at 11 n.12; *id.* at 20–21; and Dkt. 40-16 at 4–5 (Dyer SDMF ¶¶ A38–A41, B4). One of those citations appears to be incorrect. *Compare* Dkt. 40-16 at 5 (Dyer SDMF ¶ A40), *with* Dkt. 40-1 at 8 (Dyer Dep. 82:9–12). Another of those citations refers to evidence not submitted along with Dyer's opposition. *Compare* Dkt. 40-16 at 4 (citing Dyer Dep. 246–55), *with* Dkt. 40-4 at 2 (Dyer Dep.) (omitting pages 249–55). And six of those citations lack sufficient detail for the Court to determine when the conversation occurred and/or the person with whom Dyer was speaking. *See* Dkt. 40-1 at 4 (Dyer Dep. 40:2–13); Dkt. 40-2 at 2 (Dyer Dep. 96:12–17); *id.* at 5 (Dyer Dep. 106:17–20); Dkt. 40-3 at 2 (Dyer Dep. 189:22–190:2); Dkt. 37-4 at 32 (Dyer Dep. 250:10–15); *id.* at 33 (Dyer Dep. 253:6–254:11). The Court does not consider these materials. *See* Fed. R. Civ. P. 56(c)(1), (3).

and lamented that he "should have been well on [his] way to being promoted." Dkt. 40-4 at 4 (Dyer Dep. 276:2–5); *see also id.* at 4–5 (Dyer Dep. 274:12–280:22). Dyer repeated his concern that he "was having some struggles with trying to be promoted" to his new supervisor, Adan Maya, in March 2009, and did so again to three other M&S employees, including a Human Resources representative, in July and August 2009. *See id.* at 5–6 (Dyer Dep. 279:19–282:18). It is undisputed, however, that Dyer never submitted a formal "expression of interest" in promotion through M&S's internal website and that he never filed a written or electronic application for any particular position. *See* Dkt. 40-3 at 2 (Dyer Dep. 189:22–191:1); Dkt. 37-4 at 27 (Dyer Dep. 244:3–5); Dkt. 37-2 at 11 (M&S/Landry's SUMF ¶ 14).

Around June 2010, Dyer broached the subject of his non-promotion with the restaurant's senior management. He reached out separately to Connie Collins, who was then a Regional Manager for D.C.-area M&S restaurants; to Stephen Briggs, who was then the General Manager of the D.C. Grill; and to Adan Maya, who was then his direct supervisor. *See* Dkt. 40-4 at 6 (Dyer Dep. 282:19–286:14); *accord* Dkt. 37-2 at 9, 12 (M&S/Landry's SUMF ¶¶ 7, 17). Dyer asked them generally "what [he was] doing wrong" and "what [he] c[ould] . . . do to . . . break through and get promoted." Dkt. 40-4 at 6 (Dyer Dep. 284:2–3); *see also* Dkt. 37-29 at 3 (2011 email from Collins) ("[Dyer] asked to speak to me about his goals and desire to move his career forward.").

In response, Collins spoke with Briggs and Maya. Dkt. 37-2 at 12 (M&S/Landry's SUMF ¶ 17). "Both felt that [Dyer] was not performing tasks at the level needed as a Sous Chef and would need to accomplish th[o]se tasks before he could even be considered qualified for potential promotion." *Id.*; *see also* Dkt. 40-16 at 2 (Dyer SDMF) (not disputing this assertion of

fact).[5]  Collins thus responded to Dyer's inquiry by directing that Briggs and Maya prepare a

"Development Plan" for him to help him achieve his goal.  *See* Dkt. 37-2 at 12 (M&S/Landry's

SUMF ¶ 19); Dkt. 37-29 at 4.  According to an email Collins wrote a year later, Collins, Briggs,

and Maya met with Dyer to "outline[]" the Development Plan, and Dyer "agreed to work on

[it]."  Dkt. 37-29 at 4.  The Development Plan was not produced in discovery, however, and the

parties dispute whether it was ever actually put to paper.  *See* Dkt. 40-16 at 2–3 (Dyer SDMF

¶ 20).  *Compare* Dkt. 37-4 at 15 (Dyer Dep. 167:7–11) ("They were supposed to work on a plan .

. . for me . . . [but] they never followed through with it.  It was never completed."), *with* Dkt.

37-29 at 3 (April 2011 internal email from Hunter) ("[Dyer] lost the document [memorializing

the Development Plan] and brushed it off as 'stuck in a box somewhere in his house.'").

        In December 2010, Dyer received his worst performance evaluation yet.  *See* Dkt. 37-10.

Maya rated him below the "meets expectations" level in eight out of nine categories, with an

average rating of 2.8.  *See id.*  The comments highlighted particular deficits in Dyer's

performance.  Among other things, Maya admonished Dyer that "[i]t [wa]s essential that [he]

elevate [his] professional [i]nteractions with employees;" that he must "execute . . . the financial

education [he] received in [his] 2010 Development Plan;" that "[t]here [wa]s no excuse" for

failing to hold specific types of mandatory safety and food trainings; that he "ha[d] not partnered

enough with [front of the house] managers to build business;" and that, because "[his]

_____

[5]  Other managers agreed.  At deposition, Regional Chef Marcello characterized Dyer as
someone who "really struggled with leadership," and as "just . . . a warm body . . . d[oing] just
enough to get by," who "[n]ever followed recipes," "never completed tasks" and "typically . . .
passed the accountability on to somebody else."  Dkt. 37-20 at 20–21 (Marcello Dep. 127:14–
128:22).  Human Resources Director Sam Hunter likewise attested that Dyer "just wasn't
effective."  Dkt. 37-28 at 9–10 (Hunter Dep. 84:6–86:6).  According to Hunter, Dyer "wasn't a
leader or manager . . . .  There's so many things he wasn't doing on his level."  *Id.*  "[E]ven
considering [Dyer] for [a promotion] was hard," Hunter explained, "because [Dyer] was . . .
barely performing well [in] . . . his [current] position."  *Id.*

administrative skills [were] lacking," it was "essential that [he] reach out for training and become more effective." *Id.* at 2–4. The review concluded that Dyer "appear[ed] to be a key turner and not the leader that we expect." *Id.* at 4.

In April 2011, Dyer filed his first charge of discrimination against M&S with the D.C. Office of Human Rights and the Equal Employment Opportunity Commission ("EEOC"), alleging that Maya assigned him a poor performance rating "because [Maya] has a bias against [b]lack employees," and further alleging that the poor rating "[wa]s still affecting [his] chances for future promotions." Dkt. 37-18 at 3. Maya had since been transferred to another location and was no longer Dyer's supervisor. *Id.*

In September 2011, Dyer received his annual performance review from his new supervisor, Jason Boone. *See* Dkt. 37-12. Like his predecessors, Boone notes a number of deficiencies in Dyer's performance. *Id.* Assigning Dyer an average rating of 2.20—a significant drop from previous years—Boone flagged a variety of concerns. *Id.* Boone's comments included that Dyer "leave[s] without notifying fellow management;" "let[s] things 'fester' until action is necessary;" "[d]oes not listen very well;" "[d]oes not follow through with direction[s];" pays "[n]o attention to detail;" "[h]as a negative attitude;" "[s]truggles with deadlines;" "[d]oes not plan and organize well;" "[h]as trouble achieving strategic and tactical goals;" "[d]oes not follow given recipe direction[s];" and "leave[s] hazardous foods . . . out of refrigeration and then leave[s] for the day." *Id.* at 2–4. In the optional "Summary Comments" field, Boone added:

> [Dyer] has worked for McCormick & Schmick's for many years now. [He] should fully comprehend all aspects of daily operations, [but] he commonly does not. In [his] position, he should be able to execute at a high level[] all areas/aspects of daily operations, without complaint or resistance to senior management. [He] should be able to follow directions better, and be more aware of what is being asked of him. A review of this caliber is below McCormick & Schmick's standards. [Dyer] needs to work in all areas of his review, and take it upon himself to learn and progress in the areas, not just wait around to be told/shown what to do.

*Id.* at 5.

Adding to these concerns, Dyer received three written disciplinary warnings in 2012 after M&S had been acquired by Landry's. Dkt. 37-2 at 14 (M&S/Landry's SUMF ¶¶ 25, 26). The first warning, issued in March, charged Dyer with "insubordination" for failing to complete the task of baking cinnamon rolls before leaving for the day, as Boone had specifically requested. *See* Dkt. 37-13 at 2. The second warning, also issued in March, charged Dyer with "unprofessional behavior" and "falsifying company records" because Dyer had created a job verification letter that misstated his subordinate's hourly wage. *Id.* at 3–4. And the third warning, issued in August, faulted Dyer for uncritically accepting a delivery of products intended for an entirely different M&S restaurant.[6] *See* Dkt. 37-14 at 3; Dkt. 37-20 at 28 (Marcello Dep. 177:4–21). Although Dyer argues in his brief that his supervisors "disciplined [him] without bothering to obtain his version of events," Dkt. 40 at 13–15, he does not argue that the warnings were fabricated or suggest that the events did not occur.[7]

Dyer's final performance evaluation in August 2012 assigned him an average rating of just 2.0. *See* Dkt. 37-15. Boone rated Dyer "[u]nsatisfactory" or "[n]eeds improvement" in 30 of the 38 performance categories.[8] *See id.* The comments largely restated those from Dyer's

---

[6] M&S/Landry's asserts that, "[a]s a result [of Dyer's error], the D.C. Grill did not have the products on hand that it needed and the products had to be reordered," Dkt. 37-2 at 14 (M&S/Landry's SUMF ¶ 26), but the citation M&S provides for that assertion appears to be incorrect, *see* Dkt. 37-20 at 26 (Marcello Dep. 171:11–21).

[7] This portion of Dyer's brief also makes frequent reference to Dyer's declaration, *see* Dkt. 40 at 13, 14, but the Court was unable to locate that declaration in the record. Dyer's brief does not include any index of exhibits or attached materials. *See generally* Dkt. 40.

[8] By this time, Landry's had acquired M&S, and the performance review sheet had changed format. *See* Dkt. 37-15. It still rated employees on a scale of 1–5 in various categories, however, where a "1" means "Unsatisfactory," a "2" means "Needs Improvement," and a "3" means "Fully Productive." *See id.* Dyer received eight 1s, twenty-two 2s, and eight 3s, *see id.* at

2011 review, and Boone expressed frustration that Dyer "ha[d] fallen behind in all areas" since then. *Id.* at 6. Dyer's poor overall rating on his 2012 performance evaluation triggered the creation of a "Performance Improvement Plan" ("PIP") under company policy. Dkt. 37-2 at 15 (M&S/Landry's SUMF ¶ 28). Briggs and Boone prepared the PIP and presented it to Dyer. Dkt. 37-38 at 3 (Jasso Decl. ¶ 6). The PIP explained that it was intended "[t]o serve as notification that [Dyer's] performance [did] not meet[] professional standards by Landry's" and to "clarify" the company's "performance expectations." Dkt. 37-38 at 13. It then repeated many of the concerns reflected in Dyer's performance evaluations, including concerns that that Dyer "d[id] not maintain a high level of performance from his staff;" "d[id] not follow recipes;" "d[id] not finish on time;" "d[id] not plan ahead efficiently;" "ha[d] a negative attitude;" "d[id] not motivate his hourly employees well;" and "lack[ed] overall motivation himself." *Id.* at 13–14. Finally, the PIP identified various areas of "[e]xpected [i]mprovement" and set a future meeting "to discuss [Dyer'] progress concerning [his] performance." *Id.* at 14-15. Once again, Dyer does not dispute that his 2012 performance evaluation and PIP reported these deficiencies, but he does disagree with his managers' assessment of "the quality of [his] job performance." Dkt. 40-16 at 3 (Dyer SDMF ¶¶ 27–28).

Despite these increasingly critical performance evaluations, between 2010 and 2012 Dyer continued to express interest in receiving a promotion. At deposition, Dyer recounted at least

---

2–5, giving him 76 out of possible 190 points (or 40%), and putting him in the "cause for concern" range, *id.* at 5. Although the August 2012 performance evaluation in the record is unsigned, *see id.*, Dyer does not challenge its authenticity, *see* Dkt. 40-16 at 3 (Dyer SDMF ¶ 27) ("Dyer's 2012 performance review and PIP say what they say").

four such incidents.[9]  First, near "the end of 2010 or the beginning of 2011," Dyer expressly told

Marcello that he wanted to "put in [his] bid to be the next [E]xecutive [C]hef" at the D.C. Grill.

Dkt. 40-3 at 8–9 (Dyer Dep. 239:19–241:19).  There is no evidence that Dyer submitted a formal

application.  *See id.*  Second, in late March or early April 2011, Dyer asked Marcello about a

specific "[E]xecutive [S]ous or [E]xecutive [C]hef" job opening, but Marcello told him the

position had been filled.  Dkt. 40-4 at 7 (Dyer Dep. 287:10–288:8).  Third, sometime after Maya

left the D.C. Grill in mid-2012, Dyer says that he asked Marcello "what . . . [he] ha[d] to do in

order to be promoted," and Marcello responded, "Don't worry about it, Brett.  I'll take care of

you."  Dkt. 40-1 at 10 (Dyer Dep. 91:22–92:6).  And, fourth, in December 2012, Dyer recalls

"expressing an interest in being promoted" during a conversation with Brendan Lofton, the

Regional Director of Operations.  Dkt. 40-4 at 9 (Dyer Dep. 306:11–12, 307:10–21).  Again,

there is no record evidence that Dyer ever submitted a formal "expression of interest" online or

submitted written or electronic applications for any particular job openings.[10]

---

[9]  *But see supra* n.4 (noting additional incidents Dyer described, but which lack sufficient detail for the Court to determine the date on which they occurred or the person with whom they took place).

[10]  As far as the Court can tell, the only evidence the parties cite that might be read to suggest that Dyer submitted an actual application for a specific position is the following exchange from Dyer's deposition:

> Q      Did you apply for any other vacancies on or after May 21st, 2010, other than these two that you [previously] identified?
>
> A      No, I did not.

Dkt. 37-4 at 35 (Dyer Dep. 255:2–5), *cited at* Dkt. 40-16 at 4 (citing generally Dyer Dep. 246–55).  Although the question appears to *presume* that Dyer filed formal applications, the Court has not located a statement from Dyer or other evidence to that effect in the materials cited in the parties' briefs.  *See* Dkt. 37-4 at 29–35 (Dyer Dep. 246, 248–50, 253–55); Dkt. 40-4 at 2 (Dyer Dep. 247).

On April 25, 2013, Dyer filed a second EEO complaint against M&S/Landry's with the D.C. Office of Human Rights and the EEOC in which he alleged that his poor performance reviews and his occasionally late pay checks were the result of racial discrimination. *See* Dkt. 37-18 at 4. This complaint did not mention a discriminatory failure to promote. *See id.*

**B.      Dyer's Discharge from the D.C. Grill**

Around the same time that Dyer filed his second EEO complaint, Lofton learned that the D.C. Grill would be closing its doors permanently, effective May 27, 2013. Dkt. 37-2 at 15 (M&S/Landry's SUMF ¶ 29); Dkt. 37-24 at 7 (Lofton Dep. 17:8–22). M&S/Landry's had elected not to renew the building's lease, Dkt. 37-2 at 15 (M&S/Landry's SUMF ¶ 29), and Dyer does not challenge that decision here, Dkt. 40 at 5.

As was standard operating procedure, it fell to Lofton as the Regional Manager to decide which D.C. Grill employees would be transferred to other D.C.-area Landry's restaurants, and which employees would be let go. Dkt. 37-2 at 15 (M&S/Landry's SUMF ¶ 30); Dkt. 40-8 at 12 (Lofton Dep. 135:13–137:10); Dkt. 40-16 at 3 (Dyer SDMF ¶ 30). Although Dyer disputes this testimony, Lofton testified he made these determinations in early May 2013 based on the other restaurants' "current [staffing] needs." Dkt. 40-8 at 12 (Lofton Dep. 136:8–137:18). Lofton also testified, with some equivocation, that he does not remember if he was able to find a place for Dyer. *Id.* at 13 (Lofton Dep: 138:1–8); *id.* at 14 (Lofton Dep. 148:2–10) ("[M]y recollection is there was nothing open within my restaurant authority . . . in order to transfer him or we would have, more than likely—or not. I don't remember."). It is undisputed, however, that when Dyer arrived at work on May 27, 2013, Lofton informed him that M&S/Landry's "d[id]n't have any place for [him]" and that they were "going to let [him] go." Dkt. 40-4 at 3 (Dyer Dep. 263:4–264:18); *accord* Dkt. 37-2 at 17 (M&S/Landry's SUMF ¶ 34). Lofton then terminated Dyer's employment. M&S/Landry's maintains that Lofton made this decision "[b]ecause there was no

open Sous Chef position in his territory." Dkt. 37-2 at 17 (M&S/Landry's SUMF ¶ 34); see also Dkt. 37-26 at 16 (Jasso Dep. 81:14–22) ("I don't believe that we offered [Dyer] a specific position because we didn't have one in his region.").

Dyer was the only manager still working at the D.C. Grill who was terminated rather than transferred. Lofton transferred the other three managers to equivalent positions at nearby M&S/Landry's restaurants. *See* 37-2 at 16–17 (M&S/Landry's SUMF ¶¶ 31–33). Those three mangers were General Manager Jeff White (Caucasian); Assistant General Manager Sophia Kiflu (African American);[11] and Sous Chef Dario Guzman (Hispanic). *Id.* Although Dyer and Guzman were both Sous Chefs, only Guzman—the more junior of the two—was transferred.

Guzman was "promot[ed] to the position of Sous Chef at the Reston, Virginia location" in August 2012, Dkt. 37-37 at 2 (Guzman offer letter), but he had since been "transferred to the D.C. Grill," Dkt. 37-20 at 16 (Marcello Dep. 96:9–12). Dyer characterizes Guzman as a "[S]ous [C]hef in training," Dkt. 37-4 at 37 (Dyer Dep. 257:8), and, indeed, Guzman's offer letter reflects that he was originally hired into the "Manager in Training" program, Dkt. 37-37 at 2. The parties, however, have presented no evidence as to what this program entailed or whether Guzman remained a part of it in May 2013.[12] When the D.C. Grill closed, Guzman was transferred "[a]s a [S]ous [C]hef" back to his prior location in Reston. Dkt. 40-7 at 10 (Jasso Dep. 79:8–21).

---

[11] Dyer's brief asserts that Kiflu was "of Ethiopian national origin." Dkt. 40 at 15.

[12] M&S/Landry's asserts that the "Manager in Training" program "involved . . . Guzman working at different restaurants in the [D.C. area], including the D.C. Grill," Dkt. 37-2 at 16–17 (M&S/Landry's SUMF ¶ 33), but Defendants fail to support that assertion with any on-point record citation.

### C. Dyer's Application to Gordon Biersch

1. *Dyer Applies to Gordon Biersch*

Even before the D.C. Grill closed, Dyer had been looking for a new job. He contacted a third-party recruiter, Julie Spencer, and on May 2, 2013, Spencer forwarded Dyer's candidate profile to employees at Gordon Biersch. Dkt. 38-2 at 2 (GB SUMF ¶ 6); *see also* Dkt. 41-1 at 1 (Dyer SDMF). On May 16, 2013, Chris Brett, one of Gordon Biersch's internal recruiters, interviewed Dyer for a Sous Chef position. Dkt. 38-2 at 2 (GB SUMF ¶ 7); *see also* Dkt. 41-1 at 1 (Dyer SDMF). During the interview, Dyer stated that he was still working at M&S/Landry's— which was true at the time. Dkt. 38-2 at 2 (GB SUMF ¶ 7); *see also* Dkt. 41-1 at 1 (Dyer SDMF). But, as noted above, his employment with M&S/Landry's terminated eleven days later on May 27, 2013. Dkt. 38-2 (GB SUMF ¶ 8). Dyer then filed additional EEO complaints against M&S/Landry's on May 31, 2013, and June 8, 2013. *See* Dkt. 37-18 at 2, 5.

After his termination from the D.C. Grill, Dyer continued to represent to Gordon Biersch that he was still employed there, even though that assertion was no longer true. During an interview on June 8, 2013, Dyer made statements to Gordon Biersch's Regional Manager, Arthur Forgette, that at minimum left Forgette with the false impression that Dyer was still working at the D.C. Grill. *See* Dkt. 38-2 at 2 (GB SUMF ¶ 9); Dkt. 38-7 at 2–3 (Forgette Dep. 35:22–36:1). Forgette testified that Dyer told him that "he was currently working at [the D.C.] Grill," although he also testified that he did not have a specific recollection of the conversation and that he was replying, instead, on his "general practice" in conducting interviews. Dkt. 38-7 (Forgette Dep. 35:22–36:22). Dyer, in turn, testified that Forgette asked him if he "was . . . still working," and that he responded, "Yes, I'm still working." Dkt. 41-6 at 7–8 (Dyer Dep. 355:9–356:11).

On June 24, 2013, Dyer completed his online job application. Dkt. 38-2 at 2 (GB SUMF ¶ 10). In response to a question asking for his "[r]eason for leaving" M&S/Landry's, Dyer

wrote: "Still employed there."  Dkt. 37-34 at 4.  As a Gordon Biersch witness explained, however, the date reflected on the online application represents "the last time that the candidate accessed the application," Dkt. 38-5 at 5–6 (Brett Dep. 60:22–61:14), raising the possibility that Dyer's response was correct at the time him input his answer but became incorrect by the time he finalized his application.[13]  And on June 28, 2013, Dyer began to complete a background check form for Gordon Biersch, on which he falsely indicated that he was still employed at the D.C. Grill.  Dkt. 38-2 at 2 (GB SUMF ¶ 11).  According to Spencer, Dyer confided in her that he had intentionally misrepresented his employment history "because [he] didn't think they would give [him] the job" otherwise.  Dkt. 37-31 at 13–14 (Spencer Dep. 38:5–39:17).

    2.    *Gordon Biersch Extends an Offer*

On July 8, 2013, Gordon Biersch offered Dyer a job as a Sous Chef.  Dkt. 37-35.  Dyer immediately accepted.  Dkt. 38-2 at 3 (GB SUMF ¶ 14).  Within days, however, Gordon Biersch, reconsidered that decision.  The following events are recounted in the record.

On or about July 9, 2013, Forgette received a phone call from Kirk Spare, one of Gordon Biersch's General Managers with whom Dyer had interviewed.  Dkt. 38-2 at 2–3 (GB SUMF ¶¶ 12, 15); Dkt. 41-8 at 7–8 (Forgette Dep. 49:20–50:21).  Spare described how he had mentioned to an unidentified M&S/Landry's employee from the D.C. Grill that Gordon Biersch had hired Dyer.  Dkt. 41-8 at 7–8 (Forgette Dep. 49:20–50:21).  According to Spare, the M&S/Landry's employee "raised [his] eyebrows" and informed Spare that Dyer no longer worked for M&S/Landry's.  *Id.*  Based on this conversation, Spare recommended that Forgette

---

[13]  Less ambiguously, the application misrepresented his job title at M&S/Landry's as "Executive Sous Chef."  Dkt. 37-2 at 20 (M&S/Landry's SUMF ¶ 44 n.8); *see* Dkt. 37-34 at 4.  Gordon Biersch, however, does not argue that its decision to rescind its job offer to Dyer was based on that misstatement.

"look deeper" into Dyer's employment history and "maybe do some reference checks." *Id.* at 9
(Forgette Dep. 52:1–15). Spare was concerned, in particular, that Dyer may have misrepresented
"the times that he told [Gordon Biersch that] he was working at M&S Grill." *Id.*

On July 10, 2013, Brett sent Spencer an email with the subject line "RE: Brett Dyer,"
stating: "It is getting weirder and more strange by the minute." Dkt. 41-3 at 2. The following
day, Forgette sent Brett an email describing a conversation Forgette had had with one of Gordon
Biersch's chefs, Mamadou Diallo. *See* Dkt. 41-4 at 4; Dkt. 41-9 at 3 (Forgette Dep. 10:18–22).
According to Forgette's email, Diallo had previously worked for M&S as a regional chef. Dkt.
41-4 at 4. The email further explained that Diallo had "called the guy . . . he worked with," and
that guy had "said that they closed [the D.C. Grill] and had open positions in the region but
would not offer jobs to the [two] chefs (including [Dyer]) when they closed it." *Id.* Finally, the
email reported that Diallo "said he would not hire [Dyer]." *Id.* Diallo never identified "the guy
with whom he worked" at M&S. Dkt. 41-9 at 5 (Forgette Dep. 14:11–18).

3.    *Gordon Biersch Withdraws the Offer*

On July 12, 2013, one or more representatives from Gordon Biersch contacted Dyer to
rescind the company's offer. Dkt. 38-2 at 3 (GB SUMF ¶ 16); *see also* Dkt. 41-1 at 1 (Dyer
SDMF). Brett and Forgette state that they and Spare jointly made the decision to withdraw the
offer, and that they did so because they had been unable to verify Dyer's employment history
and because they believed Dyer had been untruthful with them. Dkt. 37-36 at 7 (Forgette Dep.
70:7–18); Dkt. 38-5 at 17 (Brett Dep. 118:7–20).[14] Spencer attests that it was also her

---

[14]  Forgette partially walked this statement back at his second deposition. *See* Dkt. 41-9 at 6
(Forgette Dep. 16:18–20) ("I may have had input on it, but the decision and the rescinding of the
offer was made by the recruiting department."). Dyer takes the position that Forgette was, in
fact, a decisionmaker, *see* Oral Arg. Tr. (Rough at 81) (04:38–04:39), and the Court assumes that
Dyer's position is correct.

understanding that Dyer's perceived untruthfulness was the reason the offer had been withdrawn. Dkt. 37-31 at 15 (Spencer Dep. 46:6–9). Dyer, however, "hotly contest[s]" those accounts. Dkt. 41 at 6.

According to Dyer, he received two phone calls in quick succession on July 11, 2013. Dkt. 41-6 at 9, 13 (Dyer Dep. 359:13–19, 363:1–11). He was driving at the time, so he put both calls on speakerphone. *Id.* at 11 (Dyer Dep. 361:4–8). His fiancée was also in the car, *id.* at 9–10 (Dyer Dep. 359:21, 360:18), and she has submitted a declaration stating that she "could hear both sides of the conversation[s]" and corroborating Dyer's account, *see* Dkt. 41-5 (Gonzalez-Dyer Decl.).

The first phone call was from Spencer, the third-party recruiter. Dkt. 41-6 at 9 (Dyer Dep. 359:13–16); Dkt. 41-5 at 2–3 (Gonzalez-Dyer Decl. ¶¶ 3–7). Dyer attests that Spencer was "very excited" about a call she had received from Forgette. Dkt. 41-6 at 9–10 (Dyer Dep. 359:19–360:5). According to Dyer, Spencer told Dyer that Forgette had told Spencer that Forgette received "an anonymous email" saying that Dyer "was a problem employee" and "was trouble." *Id.* Forgette had also told Spencer that this email was the reason Gordon Biersch was withdrawing the offer. *Id.*; *see also* Dkt. 41-5 at 2 (Gonzalez-Dyer Decl. ¶ 4) ("Spencer stated that . . . Forgette told her that . . . Dyer's offer was going to be rescinded because an anonymous email indicated that he was a 'trouble-maker.'"). Spencer did not mention anything about Dyer's job application being untruthful. Dkt. 41-5 at 2–3 (Gonzalez-Dyer Decl. ¶¶ 5, 6). Spencer also told Dyer to "expect a call" from Arthur Forgette. Dkt. 41-6 at 12 (Dyer Decl. 362:11–12).

The second phone call occurred shortly thereafter. The phone number on caller ID had the same first three digits as did the phone number Spencer had used. Dkt. 41-6 at 13 (Dyer Dep. 363:4–8). Dyer assumed the caller was Forgette and answered the phone by saying "Arthur."

*Id.* (Dyer Dep. 363:9–11). The man on the line immediately started talking, without acknowledging Dyer's greeting or stating who he was. *Id.* The caller then confirmed that Gordon Biersch had received the anonymous email asserting that Dyer was "trouble," that he was "a bad employee," and that Gordon Biersch should not hire him. *Id.* at 15 (Dyer Dep. 367:6–19). According to Dyer, the caller concluded by saying that he had "to protect the business and," therefore, was "going to have to withdraw the [company's] offer" of employment. *Id.* The caller did not mention the truthfulness of Dyer's application. Dkt. 41-5 at 3 (Gonzalez-Dyer Decl. ¶¶ 8–12).

Spencer, for her part, testified that she was unaware of the anonymous email and that Dyer's contention that she called to tell him about the email was untrue. Dkt. 37-31 at 15 (Spencer Dep. 46:1–22). Brett denies having received or learned of an anonymous email, and further denies that he was aware of Dyer's disciplinary history at M&S/Landry's. Dkt. 37-33 at 8–9 (Brett Dep. 159:21–160:7). Brett was also unaware of Dyer's previous EEO complaints against M&S and M&S/Landry's. *Id.* at 9 (Brett Dep. 160:16–19). As to Forgette, he testified that he did not receive any communications, including any email, about Dyer from anyone at M&S/Landry's. Dkt. 37-36 at 8 (Forgette Dep. 104:15–21). And, although the parties have not directed the Court to any portion of Forgette's deposition in which he confirmed or denied knowledge of Dyer's earlier EEO complaints, Forgette attests that those EEO complaints played no role in the decision to withdraw Dyer's offer. *Id.* at 10 (Forgette Dep. 106:4–8). Spare's deposition was not taken. *See* Dkt. 46 at 1. Dyer agrees that he never told Brett, Forgette, or Spare about his prior EEO activity. Dkt. 38-6 at 5–7 (Dyer Dep. 39:6–41:2). The "anonymous email" was not produced in discovery.

## II.  LEGAL STANDARD

The moving party is entitled to summary judgment under Federal Rule of Civil Procedure 56 if it can "show[] that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When, as here, the plaintiff bears the ultimate burden of proof, but the defendant has moved for summary judgment, the defendant "bears the initial responsibility" of "identifying those portions" of the record that "demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is "material" if it could affect the substantive outcome of the litigation.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007).  The Court, moreover, must view the evidence in the light most favorable to the nonmoving party and must draw all reasonable inferences in that party's favor.  *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

"Although summary judgment is not the occasion for the court to weigh credibility or evidence . . . summary judgment is appropriate if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Id.* (internal citations and quotation marks omitted).  The nonmoving party's opposition, accordingly, must consist of more than unsupported allegations or denials and must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  *See* Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324.  That is, once the moving party carries its initial burden on summary judgment, the nonmoving party must provide evidence that would permit a reasonable jury to find in its favor.  *See Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir.

1987).  If the nonmoving party's evidence is "merely colorable" or "not significantly probative," the Court may grant summary judgment.  *Liberty Lobby*, 477 U.S. at 249–50.

## III.  ANALYSIS

Dyer brings claims for racial discrimination in employment in violation of 42 U.S.C. § 1981 and the D.C. Human Rights Act ("DCHRA").  Both statutes "prohibit[] private employers from intentionally discriminating on the basis of race with respect to the 'benefits, privileges, terms, and conditions' of employment."  *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013) (per curiam) (quoting § 1981(b)); *accord* D.C. Code § 2-1402.11(a)(1).  He also asserts claims for retaliation under the DCHRA, which further prohibits "retaliat[ing] against," "suggest[ing]" retaliation against, or "aid[ing]" and "abet[ting]" retaliation against any person "on account of [that person] having exercised" his DCHRA rights.  *See* D.C. Code §§ 2-1402.61, 2-1402.62.

Under both statutes, when a plaintiff relies on circumstantial evidence to prove a defendant's intent, courts apply the framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See, e.g.*, *McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 3, 6 (D.C. Cir. 2010) (Title VII analytic framework applies to discrimination and retaliation claims under § 1981 and the DCHRA).  "Under this formula, an employee must first make out a prima facie case of retaliation or discrimination.  The employer must then come forward with a legitimate, non-discriminatory or non-retaliatory reason for the challenged action."  *Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016) (citations omitted).  But once the defendant proffers one or more legitimate, non-discriminatory, and non-retaliatory reasons, the Court "need not—*and should not*—decide whether the plaintiff actually made out a prima facie case."  *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).  Instead, the Court should

decide only the ultimate question: "Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non[-]discriminatory [and non-retaliatory] reason[s] w[ere] not the actual reason[s] and that the employer intentionally discriminated against the employee on the basis of race [or retaliated against the employee for engaging in protected activity]?" *Id.*; *see also Allen v. Johnson*, 795 F.3d 34, 39 & n.4 (D.C. Cir. 2015) (retaliation claim). On this question, "the ultimate burden of persua[sion] . . . remains at all times with the plaintiff." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000) (citation, internal quotation marks, and alteration omitted).

Within this general framework, Dyer asserts five claims. In Counts I and II, he alleges the M&S discriminated against him on the basis of his race, in violation of § 1981, by failing to promote him to Executive Chef. Dkt. 12-1 at 6–8 (Am. Compl. ¶¶ 29–38). In Count III, he alleges the M&S/Landry's discriminated and retaliated against him in violation of the DCHRA when it terminated his employment in May 2013. *Id.* at 8–9 (Am. Compl. ¶¶ 39–47). In Count IV, he alleges that M&S/Landry's retaliated against him in violation of the DCHRA by telling Gordon Biersch that he was a "problem" employee and thereby inducing Gordon Biersch to retract its job offer. *Id.* at 9–10 (Am. Compl. ¶¶ 48–53). And, in Count V, Dyer alleges that Gordon Biersch joined in this unlawful conduct when it retracted the job offer. *Id.* at 10–11 (Am. Compl. ¶¶ 54–58).

The Court will first address Dyer's non-promotion claims, will then turn to his termination claim, and will, finally, consider his post-termination claims.

## A.    Non-promotion Claims

Dyer asserts Counts I and II against only M&S. These counts allege that M&S's failure to promote Dyer between May 21, 2010, and his discharge on May 27, 2013, constituted unlawful racial discrimination in violation of 42 U.S.C. § 1981. *See* Dkt. 12-1 at 6–8 (Am.

Compl. ¶¶ 29–38). The May 2010 start date stems from the parties' agreement that Dyer's

§ 1981 claims are subject to a four-year statute of limitations,[15] *see* Dkt. 37-2 at 24 n.12; Dkt. 40

at 23 n.32, and from the fact that Dyer filed this lawsuit on May 21, 2014, *see* Dkt. 1-1 at 8.

Dyer does not contend that he formally applied for an Executive Chef position by, for example,

submitting an online application. Rather, he maintains that his repeated oral, informal, and

generalized "expressions of interest" in promotion created what amounts to a standing

application for promotion, such that he "was a victim of actionable race discrimination *every*

*time* after May 21, 2010, that M&S selected a non-African-American [as Executive Chef] over

him at *any* of [its D.C.-area] restaurants."[16] Dkt. 40 at 23 n.32; *accord id.* at 11–12; Dkt. 40-16

at 5 (Dyer SDMF ¶ 41). On this theory, Dyer says, approximately twenty such "nonselections"

occurred. Dkt. 40 at 11–12 (citing Dkt. 40-11 at 3–4).

---

[15] Technically, whether Dyer's non-promotion claims under § 1981 are subject to the four-year limitations period in 28 U.S.C. § 1658(a) or the three-year limitations period in D.C. Code § 12-301(8) turns on whether "the promotion[s] [would have] rise[n] to the level of an opportunity for a new and distinct [contractual] relation between [Dyer] and [M&S]." *Patterson v. McLean Credit Union*, 491 U.S. 164, 185 (1989). *See generally Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 382–85 (2004); *cf. Kargbo v. Nat'l R.R. Passenger Corp.*, No. 15-cv-698, --- F. Supp. 3d ---, 2017 WL 1047241, at *3 (D.D.C. Mar. 17, 2017). Because the parties do not raise the issue, the Court does not address it.

[16] The parties' briefs do not distinguish between Counts I and II, presumably because the two counts have functionally merged. As originally framed, Count I alleged that Dyer formally applied for, interviewed for, and was considered for a specific Executive Chef opening—which ultimately went to Duane Keller in February 2011—and that Dyer's nonselection for the Keller position constituted unlawful discrimination. *See* Dkt. 12-1 at 6–7 (Am. Compl. ¶¶ 30–33); Dkt. 37-2 at 27. By contrast, Count II alleged more broadly that Dyer "was neither considered *nor* selected for any of the [E]xecutive [C]hef positions" that arose at any D.C.-area M&S restaurant "on or after May 21, 2010," and that his nonselection for those positions constituted unlawful discrimination. Dkt. 12-1 at 7–8 (Am. Compl. ¶¶ 35–38) (emphasis added). Now that discovery has concluded, Dyer has adduced no evidence that he formally applied for, interviewed for, or was considered for the Keller position (or any other). *See supra* n.10. As a result, the Keller nonselection is properly treated as part of Count II, and Count II subsumes Count I for all practical purposes.

In response, M&S/Landry's proffers two legitimate, non-discriminatory reasons why Dyer was never promoted:  First, it says, Dyer "never applied or submitted a formal expression of interest for an Executive Chef position via the M&S job posting system," which company policy required him to do before he could be considered for any particular opening.  Dkt. 37-2 at 23–24.  Second, M&S/Landry's says, to the extent that Dyer's general expressions of interest was sufficient to create a kind of "perpetu[al]" application for all new openings that arose, Dyer "cannot possibly demonstrate that he was qualified for the Executive Chef positions at issue given his well-documented history of deficient performance."  *Id.* at 23, 26.  The question thus becomes whether Dyer has adduced sufficient evidence for a reasonable jury to find that these reasons are a mere pretext for racial discrimination.  *See Brady*, 520 F.3d at 494.

As explained below, the Court agrees with Dyer with respect to the first proffered reason: there is a genuine factual dispute whether, during the relevant time period, M&S/Landry's consistently required internal candidates to submit formal applications and expressions of interest in order to be promoted.  The second proffered reason, on the other hand, indisputably favors M&S/Landry's: Dyer identifies no evidence that would permit a reasonable jury to find that the assessment of his various managers that he lacked the skills to be promoted was in any way pretextual.  Finally, although neither party raises the issue, the Court concludes that the two non-discriminatory rationales proffered by M&S/Landry's are sufficiently independent of each other that Dyer's successful rebuttal of the first does not defeat the second.  *See Thomas v. District of Columbia*, 227 F. Supp. 3d 88, 104–05 (D.D.C. 2016).  The Court, accordingly, will grant summary judgment in favor of M&S/Landry's as to Counts I and II.

1.    *Proffered Reason One: Failure to Apply*

As a first legitimate, non-discriminatory reason, M&S/Landry's asserts that it never promoted Dyer because Dyer "never applied or submitted a formal expression of interest for an[y

particular] open Executive Chef position." Dkt. 37-2 at 24. According to M&S/Landry's, Dyer's non-promotion claims depend on the faulty premise that his informal, generalized expressions of interest were "enough [for him] to be 'considered' for *any* Executive Chef position . . . in perpetuity." Dkt. 37-2 at 26. In support of its contention that it "was simply not the case" that a "*general* expression of interest" was sufficient, *id.*, M&S/Landry's points to the testimony of Sam Hunter, who previously served as the company's Director of Human Resources, *id.* at 10, 30 n.14. And, M&S/Landry's is correct that Hunter testified that existing M&S employees were required to initiate the process by "formally express[ing] an interest" through an internal online portal. Dkt. 37-28 at 3 (Hunter Dep. 48:13–49:10).

The difficulty for M&S/Landry's, however, is that this evidence is disputed. Take, for instance, the testimony of Ralph Harrison, who served as M&S's Regional Chef for D.C. until no later than August 2006. Dkt. 43-4 at 3 (Harrison Dep. 132:1–18). Harrison testified at deposition that he at times filled Executive Chef vacancies by simply approaching lower-ranked chefs and offering them the job. Dkt. 40-5 at 6 (Harrison Dep. 56:16–57:11). Far from demanding "formal expressions of interest" of the kind Hunter described, Harrison testified that he knew which lower-level chefs to promote because most of them "were already expressing [their] interest in being . . . an [E]xecutive [C]hef," and, "[f]or the most part, they all wanted to move up to the next level." *Id.* at 6–7 (Harrison Dep. 57:21–58:14). Harrison further attested that Dyer himself expressed this kind of informal interest in promotion to Harrison during the early months of Dyer's career. *Id.* at 7 (Harrison Dep. 58:15–19).

Anthony Marcello, who succeeded Harrison as Regional Chef, also described a relatively informal process for distributing Executive Chef promotions. In fact, Marcello himself was promoted to Executive Chef at another M&S restaurant in 2002 or 2003 without submitting an

application or a formal expression of interest—Harrison simply "approached" him and offered

him the job. *See* Dkt. 40-9 at 4 (Marcello Dep. 14:7–15:18). And, once Marcello took over from

Harrison as Regional Chef in mid-2006 (a position he kept through August 2013), he offered

similar opportunities to Sous Chefs "whom [he] approached about the prospect of be[coming] an

[E]xecutive [C]hef." *Id.* at 10 (Marcello Dep. 91:4–8); *see id.* at 7, 9–10 (Marcello Dep. 27:3–9,

87:21–91:8).

Finally, Landry's corporate representative Laura Jasso testified that, although it was her

understanding that M&S had a formal application requirement on the books *before* its acquisition

by Landry's in January 2012 (whether the policy was consistently enforced is another matter),

*after* January 2012, the Landry's-managed D.C. Grill "didn't have any application process for

internal candidates or anywhere for them to go to express interest such as [M&S] had pre-

acquisition."[17] Dkt. 40-7 at 5–6 (Jasso Dep. 41:19–42:5, 54:17–22).

This testimony from Harrison, Marcello, and Jasso is more than sufficient to create a

genuine factual dispute as to whether, at all times between May 21, 2010, and May 27, 2013, the

D.C. Grill's management consistently enforced a requirement that Sous Chefs submit written

applications or formal "expressions of interest" in order to be considered for promotion. *Cf.*

*Cones v. Shalala*, 199 F.3d 512, 518 (D.C. Cir. 2000) ("If Margaret Dodd could get the position

by expressing her interest to Elizabeth James, Cones can certainly establish [that he 'applied for'

---

[17] According to M&S/Landry's, the time period after Landry's took over the D.C. Grill is irrelevant to its first proffered non-discriminatory reason because Dyer "only informally expressed interest" in being promoted *before* January 2012. *See* Dkt. 37-2 at 24 n.13; Dkt. 43 at 4–5. But, as noted above, Dyer attests that he expressed such interest to Marcello mid-way through 2012, and then again to Lofton in December 2012. *See* Dkt. 40-1 at 10 (Dyer Dep. 91:19–92:6); Dkt. 40-4 at 9 (Dyer Dep. 307:10–21). It is unclear whether this matters, however, because Counts I and II of Dyer's amended complaint name only M&S. Dkt. 12-1 at 6–8 (Am. Compl. ¶¶ 29–38).

the position for purposes of making out a prima facie case] by demonstrating that he did precisely the same thing.").  As a result, a reasonable jury could find that M&S's first proffered non-discriminatory rationale—Dyer's failure formally to apply—was not the true reason that M&S failed to promote Dyer.

> ### 2.  *Proffered Reason Two: Lack of Qualifications*

M&S's second proffered legitimate, non-discriminatory reason—*i.e.*, that management considered Dyer unqualified for promotion—fares better.  As recounted at length above, M&S has adduced undisputed evidence that senior managers like Marcello, Hunter, and Briggs considered Dyer unfit to serve as an Executive Chef, and, in fact, had concerns about his ability to perform his existing role as Sous Chef.  *See supra* Part I.A.  M&S/Landry's has also adduced undisputed evidence that Dyer received increasingly critical reviews from his direct supervisors, accompanied by increasingly exasperated comments.  *See id.*  And M&S has shown by undisputed evidence that management's concern about Dyer's poor performance culminated in a formal PIP, alerting Dyer "that [his] performance d[id] not meet[] [the company's] professional standards."  *See* Dkt. 37-16 at 2.

None of Dyer's attempts to cast this evidence as "mere pretext" for discrimination are sufficient to create a genuine issue of material fact.

> ### a.  Dyer's "Countervailing Evidence of his Qualifications"

Dyer's principal response—and, indeed, the only one he makes in the argument section of his brief—contends that M&S's unfavorable assessment of his qualifications cannot justify the entry of summary judgment because, in his view, a reasonable jury could conclude that Dyer was, in fact, qualified for promotion during the relevant time period.  *See* Dkt. 40 at 2, 22–24 ("Of course, a jury *could* accept the judgment of M&S management that Dyer was not qualified to be an [E]xecutive [C]hef.  But[] a jury could also accept Dyer's countervailing evidence of his

qualifications . . . ."). This argument, however, misunderstands the relevant standard. The question is not whether a reasonable jury could disagree with M&S's assessment of his qualifications. Rather, to avoid summary judgment, Dyer must adduce evidence from which a reasonable jury could find that M&S's proffered reason "is a lie," in the sense that it is not an honestly held belief. *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1288 n.3 (D.C. Cir. 1998) (en banc); *see also, e.g.*, *Fischbach v. D.C. Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("Once the employer has articulated a non-discriminatory explanation for its action . . . , the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes [them].") (citation, internal quotation marks, and alterations omitted). Thus, even if Dyer were correct that reasonable minds could differ as to whether his track record at the D.C. Grill demonstrated his readiness to serve as Executive Chef, that showing would not by itself suffice.

That said, in some circumstances, "the fact that a proffered reason is objectively false may undermine an employer's professed honest belief in that reason." *George v. Leavitt*, 407 F.3d 405, 415 (D.C. Cir. 2005); *see also Reeves*, 530 U.S. at 147 ("In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose."). This is so because "honesty and reasonableness are linked: a belief may be so unreasonable that a factfinder could suspect it was not honestly held." *DeJesus v. WP Co. LLC*, 841 F.3d 527, 534 (D.C. Cir. 2016). As applied here, evidence that some of Dyer's supervisors held him in high regard might support a claim that those professing to disagree did not honestly hold that belief. Thus, it may be the case that Dyer intends to argue that the assessments of Dyer's abilities set forth in his performance evaluations, disciplinary warnings, and PIP were so inconsistent with reality or the views of

others that a reasonable jury could find that M&S's management did not honestly believe that Dyer's performance as a Sous Chef was subpar.[18] *See, e.g.*, *Aka*, 156 F.3d at 1295.

Even if Dyer had made this argument, however, the Court would conclude that no reasonable jury could find that Dyer's own assessment of his qualifications or the handful of neutral or positive comments made by others are sufficient to show that the repeated negative assessments of his performance, made by a variety of supervisors over an extended period of time, were knowingly false and a pretext for discrimination. Most significantly, Dyer relies on the views of two supervisors, neither of whom ever considered Dyer for a promotion, regarding Dyer's performance from December 2005 to August 2006. Dkt. 40 at 23. First, he points to the deposition testimony of Regional Chef Harrison, who overlapped with Dyer for less than nine months before leaving the company no later than August 2006, and who recalls thinking that Dyer was "a good guy" and "a long-term player [who] wanted to progress in the company." Dkt. 40-5 at 7 (Harrison Dep. 59:4–7, 60:19). When asked whether Dyer was "qualified to be an [E]xecutive [C]hef," Harrison initially responded, "Yeah, I thought Brett was pretty good," but he then tempered his response by noting that he overlapped with Dyer for less than a year and that, even if a vacancy had existed, he "most likely" would not have promoted Dyer without a year's experience and an annual evaluation demonstrating a "great" performance "throughout that year." *Id.* (Harrison Dep. 59:21–61:14). Second, Dyer points to his August 2006 performance review from Executive Chef Jalloh, which assigned him an average overall rating of

---

[18]  The statement closest to this effect in Dyer's brief is his explanation that he intends to demonstrate "pretext" through "evidence that the stated reason . . . , *i.e.*, lack of qualifications, was false." Dkt. 40 at 24.

3.3—or just above the "[m]eets [e]xpectations" level—on a scale of 1 to 5.  *See* Dkt. 37-7.  That evaluation included some praise,[19] and some criticism.[20]

Drawing all inferences in Dyer's favor, these pieces of evidence would permit a reasonable jury to conclude that Dyer got off to either a good or acceptable start during his first nine months on the job.  But such a finding, without more, would not permit a reasonable jury to go on to find that Dyer's later evaluations were not only unfair, but knowingly false and, indeed, fabricated as a pretext for the company's decision to deny Dyer promotion in May 2010 and later because of his race.  By that time, M&S had almost another four years to observe Dyer's performance, and nothing in Harrison's testimony or Jalloh's evaluation regarding Dyer's performance *between December 2005 and August 2006* would permit a reasonable jury to find that each of the many supervisors who evaluated Dyer's performance *between August 2006 and August 2012* was lying and that, in truth, they believed he was an outstanding employee.

To the contrary, many of the same deficiencies noted in Dyer's later evaluations are foreshadowed in the Jalloh evaluation.  Thus, for example: (1) where Jalloh observed that Dyer "needs to take charge, and try to res[ol]ve problems instead of waiting" for his manager, Dkt. 37-7 at 3, Hagstad later observed that Dyer "tends to forward problems to" his manager, Dkt. 37-8 at 2, (2) where Jalloh observed that Dyer "needs to . . . [e]nforce gro[o]ming, and hygien[e] rules

---

[19]  *E.g.*, "Brett is dependable," "assumes responsibility and accountability," has relevant "product knowledge," "is very consistent," and "manages the expo in a timely manner, and ensure[s] guest satisfaction."  Dkt. 37-7 at 3–4.

[20]  *E.g.*, "Brett needs to clearly communicate[] his intentions and expectations," "needs to follow-up with write ups and coaching," needs to "[e]nforce gro[o]ming, and hygiene[e] rules regardless [of] who" violates them, "needs to show some flexibility and [to] demonstrate[] enthusiasm," "needs to take charge, and try to resolve problems instead of waiting for [his manager]," and "should demonstrate leadership and ownership in running the rest[a]urant[]."  Dkt. 37-7 at 2–3, 5.

regardless" of who was violating them, Dkt. 37-7 at 2, Maya later observed that Dyer needs to "reinforce uniform, grooming and hygiene" rules, Dkt. 37-9 at 2, and (3) where Jalloh observed that Dyer "should demo[n]strate leadership and ownership in running the rest[a]urant[]," Dkt. 37-7 at 5, Maya later observed that Dyer "appear[s] to be a key turner and not the leader that we expect," Dkt. 37-10 at 5.  In addition, although Harrison testified that Dyer was a "good guy" with potential, Dyer has offered no evidence that Harrison ever shared this perspective with any of the relevant decisionmakers, *see Giles v. Transit Emps. Fed. Credit Union*, 794 F.3d 1, 7 (D.C. Cir. 2015) (noting that positive performance assessment was of "exceptionally limited relevance" because it was not communicated to decisionmakers), or any other evidence that would permit a reasonable jury to infer from Harrison's early impressions of Dyer's work that the criticisms offered by Dyer's supervisors in later years were fabricated.

Accordingly, although "[i]n some cases, a positive evaluation is inconsistent with an employer's assertion of poor performance and therefore suggests pretext," *id.* at 7, nothing that Dyer has identified in Harrison's testimony or Jalloh's evaluation of Dyer's performance rises to this level.  Rather, those comments were dated; in the case of Harrison, there is no evidence that his views were conveyed to any relevant decisionmaker; and, in case of Jalloh, his comments were "consistent with" the criticisms offered by his successors, *id.*  At this point, the Court's role comes to end; absent *some* evidence of pretext, it is not the role of the Court to act as a "super-personnel department that reexamines" the merits of an entity's personnel decisions.  *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999) (citation omitted); *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir. 2006) (same); *Giles*, 794 F.3d at 7 (same).

Read liberally, Dyer's brief also attempts to show that a reasonable jury could find that M&S's assessment of his qualifications was knowingly false by citing his own deposition

testimony. *See* Dkt. 40 at 23. Specifically, he points to his own testimony that he served as the D.C. Grill's *de facto* Executive Chef for an extended period of time "around 2006," that he performed well in that role, and that the D.C. Grill moved from "number 68 in the region for the whole United States as [M&S] properties" to number one during his "tenure." Dkt. 40-2 at 3 (Dyer Dep. 97:4–100:15). Dyer also points to his own testimony that Marcello asked him at various points to train newly hired chefs (some of whom were or soon became Executive Chefs), and that he saw himself as "instrumental" to the process. *See id.* at 4, 6–7 (Dyer Dep. 102:14–104:7, 125:17–129:12).

These portions of Dyer's deposition, however, are nothing more than Dyer's "own 'subjective assessments of [his] own credentials,' which are 'largely irrelevant' for purposes of establishing discriminatory motive." *Bell v. Donley*, 928 F. Supp. 2d 174, 180 (D.D.C. 2013) (quoting *Washington v. Chao*, 577 F. Supp. 2d 27, 44 (D.D.C. 2008)); *see also, e.g.*, *Walker v. Johnson*, 798 F.3d 1085, 1094 (D.C. Cir. 2015) ("[Plaintiff's] own personal opinion is inadequate by itself to create an issue for the jury."). After all, "it is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff." *Vatel v. Alliance of Auto. Mfrs.*, 627 F.3d 1245, 1247 (D.C. Cir. 2011) (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 280 (4th Cir. 2000)). And Dyer's own subjective judgment of his value to the restaurant says little about whether the managers' belief that he was not qualified for promotion was objectively unreasonable. Where Dyer might have come forward with objective evidence, moreover, he has failed to do so. Notably, although Dyer testified at his deposition that he had "paperwork to attest to [the D.C. Grill's rise in the rankings]" during his informal tenure as the de facto Executive Chef, Dkt. 40-2 at 3 (Dyer Dep. 97:8), he has failed to produce any such documents to the Court. In addition, and most importantly for present purposes, Dyer has failed

to offer *any* evidence that the relevant decisionmakers shared his view that this purported rise in the restaurant's ranking was attributable to his excellent performance. As Dyer concedes, "Jalloh's management at" the D.C. Grill "absolutely" played a role in achieving the improved ranking. Dkt. 40-2 at 4 (Dyer Dep. 101:11–14). To this, he adds the unsupported, subjective judgment that the success was a "team" effort and that he was responsible for providing the necessary "direction" in the kitchen. *Id.* (Dyer Dep. 101:15–21). He may or may not be right about that. The relevant question, however, is whether there is sufficient evidence for a reasonable jury to find that the less flattering views of his supervisors were pretext for discrimination, and his subjective assessment of his own contribution does not suffice to meet that burden.

Dyer's last piece of "countervailing evidence of his qualifications" consists of "the assurances he received from M&S management that he was next in line for promotion." Dkt. 40 at 23 (citing Dyer Dep. 235:9–15). But Dyer fails to attach the cited material to his summary judgment brief. *See* Dkt. 37-4 at 26–27; Dkt. 40-3 at 7–8. The Court therefore considers neither the cited evidence nor the argument it is intended to support. *See* Fed. R. Civ. P. 56(c)(1)(A) (requiring parties to support factual assertions by "citing to particular parts of materials *in the record*") (emphasis added). Dyer concedes, moreover, that he has not challenged his non-promotion to the position he was purportedly promised, Dkt. 45-1 at 62 (Dyer Dep. 238:18–239:7), and he has failed to explain how his non-promotion in 2006 has any bearing on whether his subsequent performance evaluations were honest; whether those who declined to promote him between May 2010 and May 2013 acted with discriminatory intent; or, indeed, whether they even knew about any promise his prior supervisor—who left the company in August 2006—may have made.

Dyer's attempt to demonstrate pretext through "countervailing evidence of his qualifications" is, accordingly, unavailing.[21]

### b. Dyer's Remaining Arguments for Pretext

Dyer makes four additional arguments regarding pretext in the introduction of his brief, *see* Dkt. 40 at 2–4, but he fails meaningfully to develop them in the argument section, *see id.* at 21–24.  Dyer has therefore failed to raise these arguments.  *See Cement Kiln Recycling Coal. v. EPA*, 255 F.3d 855, 869 (D.C. Cir. 2001) (per curiam) ("A litigant does not properly raise an issue by addressing it in a 'cursory fashion' with only 'bare-bones arguments.'") (quoting *Wash. Legal Clinic for the Homeless v. Barry*, 107 F.3d 32, 39 (D.C. Cir. 1997)).  And, in any event, the Court finds them unpersuasive.

*First*, Dyer argues that "the lack of standards and the subjectivity of M&S's 'tap on the shoulder' promotion system . . . by itself raises a genuine question of material fact."  Dkt. 40 at 2–3.  In support, he cites *Adorno v. Port Authority of New York & New Jersey*, 258 F.R.D. 217, 232 (S.D.N.Y. 2009) ("[T]he lack of criteria in promotions is sufficient to raise a genuine issue of material fact."), and *Watson v. National Linen Service*, 686 F.2d 877, 881 (11th Cir. 1982) ("[T]he failure to establish fixed or reasonably objective standards and procedures for hiring is a discriminatory practice.").  *Id.* at 2–3, 22.  He also asserts that Marcello and Hunter's testimony that Dyer "struggled with 'leadership' and 'accountability'" and "was not 'effective,'" *see supra* n.5, constituted improperly "vague[]" and "subjective judgments," Dkt. 40 at 22.

---

[21]  Although Dyer's brief also makes some gestures at an argument based on *relative* qualifications, *see* Dkt. 40 at 23, that argument is too insubstantial and unsupported to warrant consideration and, in any event, was expressly abandoned, *see id.* at 24 ("Dyer has chosen an evidentiary path to pretext other than relative qualifications," and, accordingly, "the issue of relative qualifications is of no moment in evaluating M&S's motion for summary judgment.").

Even accepting Dyer's view of the law, however, the cited statements come nowhere near showing that M&S employed a subjective or standardless system for promotions. To the contrary, the judgments that Dyer lacked leadership skills and accountability, and that Dyer was not "effective" as a Sous Chef, are given substantial content by Dyer's various performance reviews. Those evaluations explain—in concrete and specific ways—how Dyer was unable to manage his subordinates, routinely passed his responsibilities onto other employees, and generally failed to execute many of the duties required of Sous Chefs at M&S, including preparing recipes and managing part of the restaurant's finances. *See infra* Part I.A. The "judgment" that such a person is not qualified to receive *more* responsibility as the restaurant's Executive Chef does not represent the kind of standardless approach that Dyer attacks.

*Second*, Dyer argues that, because "M&S did not maintain contemporaneous records of its [E]xecutive [C]hef selection process or of the selection decisions themselves," Dkt. 40 at 8, the existence of racial animus cannot be assessed without testing the credibility of the decisionmakers' oral testimony, *id.* at 3. But the D.C. Circuit squarely rejected this argument in *Adeyemi v. District of Columbia*, 525 F.3d 1222 (D.C. Cir. 2008), where it wrote:

> [The plaintiff] also asserts that there is no contemporaneous evidence of [the defendant's] qualifications-based explanation. And [the plaintiff] hints that [the defendant] has manufactured its justifications after the fact. But the absence of contemporaneous evidence is hardly unusual; employers ordinarily do not "publish a contemporaneous statement of reasons every time they make a hiring or firing decision." We therefore decline to find any significance in the timing of [the defendant's] explanation.

*Id.* at 1228 (citation omitted). Here, moreover, there is an ample written record of the deficiencies in Dyer's performance that, according to M&S/Landry's, made him unsuitable for promotion; in short, this is not a case in which one could plausibly argue that those concerns were manufactured after the fact. Dyer's argument from the lack of contemporary documentation, accordingly, fails as a matter of law and fact.

*Third*, Dyer argues that M&S personnel data demonstrates M&S's poor general track record of promoting black Sous Chefs to Executive Chefs at its D.C.-area restaurants. *See* Dkt. 40 at 3, 9, 24. Although Dyer never explicitly frames his argument in relation to existing law, he appears to rely on the rule that "statistical data and comparative information concerning an employer's treatment of minorities," while not ordinarily dispositive in individual disparate treatment cases, "can [still] be used by a plaintiff . . . to show that the employer's stated reasons for the challenged action[] are a pretext for discrimination." *Minority Emps. at NASA v. Beggs*, 723 F.2d 958, 962 (D.C. Cir. 1983) (per curiam); *accord Krodel v. Young*, 748 F.2d 701, 710 (D.C. Cir. 1984); *see, e.g.*, *Warner v. Vance-Cooks*, 956 F. Supp. 2d 129, 159 (D.D.C. 2013). No firm standards guide what form statistics must take in a disparate treatment action, but it is safe to say that they should not be "so simplistic as to lack meaning." *Krodel*, 748 F.3d at 710 (citation omitted). Ultimately, "a trial judge should be allowed to consider a disparate treatment plaintiff's statistics and to judge for herself their meaningfulness to the question of discriminatory intent." *Id*. As explained below, Dyer's evidence is far too flimsy to permit a reasonable jury to infer that M&S's stated reasons for not promoting Dyer were pretextual.

Two spreadsheets in the record are relevant in this regard. The Court will refer to them as "Spreadsheet One" and "Spreadsheet Two."[22] *See* Dkt. 40-11 at 3–4; *id.* at 5. Spreadsheet One lists 20 Executive Chefs who worked for M&S the Washington, D.C. area, three of whom were black. *See* Dkt. 40-11 at 3–4. It also lists the chefs' (1) names; (2) "hire date[s];" (3) "termination date[s];" (4) titles (as of termination); (5) restaurants (as of termination); and (6)

---

[22] The parties refer to these two spreadsheets as "Exhibit H-2, H-3" and "Exhibit H-4," respectively. The record also contains a more limited spreadsheet that M&S initially produced, which the parties term "Exhibit H-1." *See* Dkt. 40 at 9; Dkt. 43 at 10. But that information is repeated in Spreadsheet One. *See* Dkt. 40 at 9.

races.  *Id.*; *see also* Dkt. 40 at 9 n.7.  It does not say, however, whether any of these chefs requested or received promotions, nor does it say anything about the racial makeup of the applicant pool.  *See* Dkt. 40-11 at 3–4.  The only promotions-related data are found in Spreadsheet Two, Dkt. 40-11 at 5, which specifies which Executive Chefs in Spreadsheet One received their positions through internal promotions, *see* Dkt. 40-15 at 5–6.  Spreadsheet Two identifies twelve Executive Chef selectees between January 2001 and April 2014, three of whom were black (25%), two of whom were Hispanic (≈17%), and seven of whom were white (≈58%).[23]  *See* Dkt. 40-11 at 5.  Once again, it says nothing about the racial compositions of the promotions' applicant pools.  *See id.*

According to Dyer's attorneys (he designates no expert witnesses), these spreadsheets demonstrate that "M&S employed ten black [S]ous [C]hefs [not including Dyer] during Dyer's tenure," but promoted only one of them.  Dkt. 40 at 24; *accord* Dkt. 43 at 11.  This evidence, Dyer says, could persuade a reasonable jury that "black [S]ous [C]hefs did not fare well in M&S's standardless promotion system controlled by white decisionmakers," thereby permitting the inference that M&S's proffered explanation is pretextual.  *See* Dkt. 40 at 3, 9.  The Court is unpersuaded.

Among other contentions, M&S/Landry's argues that Dyer's use of statistical evidence is unavailing because statistical evidence is of "little, if any[,] relevance" in an individual disparate

---

[23]  In fact, Spreadsheet Two identifies *thirteen* Executive Chefs, *four* of whom were black.  *See* Dkt. 40-11 at 5.  But one of those chefs—Chamichael Robinson—received his promotion to Executive Chef at an M&S restaurant outside the D.C.-area, and transferred into his D.C. restaurant as an Executive Chef.  Dkt. 40 at 24 n.35; Dkt. 40-6 at 14 (Hunter Dep. 156:13–20).  Dyer objects that Robinson should not be considered in this analysis because he "was not promoted to [E]xecutive [C]hef by management in the D.C. region."  Dkt. 40 at 24 n.35.  Because M&S/Landry's does not respond to this argument, *see generally* Dkt. 43, the Court will assume for purposes of this opinion that Robinson's promotion is not relevant.

treatment case.  Dkt. 43 at 10 (citation omitted).  That argument somewhat overstates the law, at least in the D.C. Circuit.  To be sure, the D.C. Circuit has recognized that statistical evidence is "less significant" in an individual disparate treatment case than in a disparate impact case "because the ultimate issue is whether the *particular* plaintiff was the victim of an illegitimately motivated employment decision."  *Krodel*, 748 F.2d at 710.  That does not mean, however, that statistical evidence is necessarily irrelevant "to a showing of pretext in [a] disparate treatment [case]."  *Id*.  Although "ordinarily not dispositive," it "may be helpful" in meeting the plaintiff's burden, depending "on all the surrounding facts and circumstances."  *Id.* (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 340 (1977)).

Were it possible for a reasonable jury—on its own—to draw well-founded inferences of discriminatory intent from the spreadsheets, the provision of those tables and basic analysis by Dyer's counsel might prove helpful.  The failure to designate an expert witness to interpret and explain the relevant data, moreover, is not invariably fatal.  *See Frazier v. Consol. Rail Corp.*, 851 F.2d 1447, 1453 (D.C. Cir. 1988) ("We are not prepared to say that the . . . statistic calculation is so simple and straight forward that an expert is never required . . . [,] [n]or do we wish to be understood as holding that an expert is always required.").  Here, however, whether supported by an expert or not, Dyer's statistical evidence is too incomplete to permit a reasonable juror to infer anything meaningful about the hiring process.

Consider just two examples.  First, Dyer offers no evidence about the number of applicants for the Executive Chef positions, their race, or which of those applicants was qualified.  Yet, "[w]ithout evidence of the pool of available and qualified applicants," a reasonable jury "could not know whether the" number of black selectees was "'disproportionately small to the pool, disproportionately large, or approximately statistically

perfect.'"[24] *Whitacre v. Davey*, 890 F.2d 1168, 1172 (D.C. Cir. 1989) (quoting *Whitacre v.*

*Davey*, 727 F. Supp. 636, 639 (D.D.C. 1988)).  And, second, Dyer offers no evidence—expert or

otherwise—that would permit a reasonable jury to conclude that any underrepresentation of

black employees in the twelve hiring decisions reflected in Spreadsheet Two should even be

given weight at all, considering the small number of decisions the data reflects.  *See*, *e.g.*, *Mayor*

*of Phila. v. Educ. Equal. League*, 415 U.S. 605, 621 (1974) ("[T]he District Court's concern for

the smallness of the sample presented by the 13-member Panel was . . . well founded."); *Harris*

*v. Grp. Health Ass'n, Inc.*, 662 F.2d 869, 872 & n.8 (D.C. Cir. 1981) (similar).

      Dyer's counsel identified both of these potential deficiencies, among others, while still in

discovery.  Dkt. 34 at 5; Dkt. 29 at 3.  And it may simply be that such evidence does not exist.

*See* Dkt. 40 at 3 n.3 ("M&S never produced contemporaneous records of its selection decisions,

and evidently no records exist.").  However, without it—or circumstances that are so straight

forward or striking that a reasonable jury could find on its own that any underrepresentation was

statistically significant—"plaintiff's numbers are simply irrelevant."  *Hovath v. Thompson*, 329

F. Supp. 2d 1, 11 (D.D.C. 2004); *see also Thomas v. Chao*, 65 F. App'x 321, 324 (D.C. Cir.

---

[24] The closest Dyer comes to identifying a relevant pool of applicants is his suggestion that the Sous Chefs identified in Spreadsheet One would have likely been interested in promotion. *See* Dkt. 40 at 3.  There is no evidence, however, indicating that all—or even any—of those Sous Chefs, in fact, sought promotion *and* were qualified.  *See Aliotta v. Bair*, 614 F.3d 556, 566 (D.C. Cir. 2010) ("[Plaintiffs] cannot include as evidence of discrimination the statistics of a group of employees who . . . suffered no adverse employment action.").  Moreover, although Dyer correctly points to evidence that M&S preferred to promote internal candidates, that evidence does not answer the problem that he does not account in any way for external candidates, no matter how much better qualified they might have been.  And, finally, it is undisputed that the Spreadsheet One lists only the positions those chefs occupied at the end of their M&S careers—not at the beginning.  *See* Dkt. 40 at 9 n.7; Dkt. 43 at 11.  As a result, the evidence is equally consistent with the possibility that some or all of the nine black Sous Chefs began in entry level positions (say, as line cooks) and then advanced through the ranks to Sous Chefs—undermining Dyer's unsupported assumption that they never received promotions.

2003) ("The District Court was correct to exclude from evidence the list of employees identified by race and sex, and witness' observations about the race and sex of employees, in the absence of an expert who could testify that the alleged underrepresentation was statistically significant.").

Dyer's effort to use statistical evidence to demonstrate pretext, accordingly, also fails as a matter of law.

*Finally*, Dyer at least implicitly suggests that the existence of six prior lawsuits brought between 2006 and 2011 alleging employment discrimination against M&S could give rise to an inference of pretext. *See* Dkt. 40 at 3–4. But Dyer gives no indication that the cases have any bearing on the specific factual issues in this case, apart from the fact that the relevant defendant is a large, multi-state employer. *See id.* Nor does Dyer cite any authority to suggest that these other lawsuits (none of which yielded a result on the merits)[25] constitute admissible—or even relevant—evidence. *See id.* The Court is unpersuaded that mere allegations in decade-old lawsuits against M&S suffice to demonstrate pretext, even if those claims involve similar causes of action. *See Hairston v. Vance Cooks*, 773 F.3d 266, 274–75 (D.C. Cir. 2014); *Holcomb v. Powell*, 433 F.3d 889, 899–900 (D.C. Cir. 2006).

As a result, Dyer has failed to rebut M&S's second proffered non-discriminatory reason.

3.    *Interdependence of Proffered Reasons*

Having concluded that a jury reasonably could disbelieve one of M&S's proffered reasons but not the other, the Court must now consider whether summary judgment is warranted

---

[25] One of the case citations appears to be incorrect: the Court could not locate the case *Jones v. McCormick & Schmick's Seafood Restaurants, Inc.*, 1:12-cv-4503-RMB-AMD (E.D. Pa. 2011). If Dyer meant to cite *Jones v. McCormick & Schmick's Seafood Restaurants, Inc.*, 2:11-cv-7474-MAM (E.D. Pa. 2011), that case was transferred to the District of New Jersey, where the judge ultimately granted summary judgment for M&S on all claims, *see Jones v. McCormick & Schmick's Seafood Restaurants, Inc.*, No. 1:12-cv-04503 RMB, 2014 WL 1669808 (D.N.J. Apr. 28, 2014).

under these circumstances. Neither party addresses the issue in their briefs. As explained below, however, the Court's own analysis confirms that Dyer must rebut *both* of M&S's proffered reasons in order to defeat the summary judgment motion.

As a general rule, a plaintiff must "demonstrate that *each . . .* proffered non[-discriminatory] reason[] for the [challenged action] was pretextual" in order to defeat a summary judgment motion. *Kirk v. Small*, No. 03-5360, 2004 WL 1249294, at *1 (D.C. Cir. June 7, 2004) (per curiam) (emphasis added); *see also, e.g., Thomas*, 227 F. Supp. 3d at 104–05; *Brown*, 920 F. Supp. 2d at 70–71; *Hariston v. Boardman*, 915 F. Supp. 2d 155, 161 (D.D.C. 2013); *Hicks v. Gotbaum*, 828 F. Supp. 2d 152, 162 (D.D.C. 2011). There may be exceptions to this rule, however, if the "reasons are intertwined" or if "pretext is otherwise obvious." *Kirk*, 2004 WL 1249294, at *1 (citing *Russell v. Acme-Evans Co.*, 51 F.3d 64, 69–70 (7th Cir. 1995)); *see also DeJesus*, 841 F.3d at 533 (same). In those cases, "the company's honesty is so far drawn in question, and the plausibility of supposing that the action was not based on an invidious motive is so weakened, that the defendant cannot possibly stave off a trial." *Russell*, 51 F.3d at 69. But, if the company has offered a reason that "*if [it] stood alone*" would have justified the company's decision, summary judgment is warranted unless the plaintiff rebuts that specific reason. *Id.*

Applying this framework, the Court concludes that the two proffered reasons are not "intertwined" in a manner that would allow a reasonable jury to doubt M&S/Landry's second rationale for not promoting Dyer. For present purposes, the Court assumes that Dyer will able to prove at trial that internal applicants for promotion at M&S/Landry's were not required to submit formal applications or expressions of interest in order to be considered for a *particular* opening. But, even if true, that fact does not cast doubt on M&S/Landry's separate contention that management did not consider him qualified to serve as Executive Chef *in general*. And, in fact,

the undisputed evidence shows that M&S management did give thought to Dyer's interest in promotion and affirmatively concluded that he was unqualified. *See, e.g.*, Dkt. 40-13; Dkt. 37-2 at 12 (M&S/Landry's SUMF ¶ 17); Dkt 40-16 at 2 (Dyer SDMF ¶ 20). Perhaps, if management believed that Dyer was qualified, the company would have found a place for him, even without a formal application. But the opposite does not follow: if management had permitted him to apply for a specific position without a formal application, the undisputed evidence shows that the company would still have concluded that he was unqualified. Nor is "pretext otherwise obvious." The Court therefore concludes that Dyer's successful rebuttal of M&S/Landry's first reason does not automatically defeat the second, which he has otherwise failed to rebut.

The Court, accordingly, will **GRANT** the motion for summary judgment as to Counts I and II.

### B.    Termination Claims

Count III of the complaint alleges that the May 2013 decision to terminate Dyer's employment—rather than transfer him to a new restaurant—constituted unlawful discrimination and retaliation, both in violation of the DCHRA. *See* Dkt. 12-1 at 8–9 (Am. Compl. ¶¶ 39–47). Because M&S/Landry's has failed to carry its burden of showing that no reasonable jury could find that the company's proffered reason for terminating Dyer was pretextual, and that the actual reason was either unlawful discrimination or retaliation, the Court will deny this portion of M&S/Landry's summary judgment motion.

According to M&S/Landry's, its decision to discharge Dyer is fully explained by the fact that "Landry's closed the D.C. Grill after the lease expired." Dkt. 37-2 at 30; *see also* Dkt. 43 at 13, 15 n.12 (confirming this as the only proffered non-discriminatory reason Landry's intends to assert). But Dyer did not work for the D.C. Grill; he worked for M&S/Landry's. *See* Oral Arg. Tr. (Rough at 26–27) (02:49) (conceding this point). And when a Landry's-owned restaurant

closes, Landry's "generally . . . mak[es] decisions about whether [that restaurant's] employees will be transferred" to *other* Landry's restaurants. Dkt. 37-2 at 15 (M&S/Landry's SUMF ¶ 30). Indeed, every other manager still at the D.C. Grill at the time of the closing, including fellow Sous Chef Dario Guzman, received this type of treatment. *See supra* Part I.B. As a result, Landry's proffered justification sidesteps the actual question posed by Dyer's complaint: why did Landry's terminate Dyer *instead of transferring him* to another Landry's restaurant?[26]

M&S/Landry's separately asserts that "there was no open Sous Chef position" in its D.C.-area restaurants, so the decisionmaker, Brandon Lofton, "determined he had no choice but to terminate [Dyer]'s employment." Dkt. 37-2 at 17 (M&S/Landry's SUMF ¶ 34); Oral Arg. Tr. (Rough at 27) (2:50) (The Court: "What is the defendant's asserted non[-]discriminatory reason for not moving Mr. Dyer to a different position?" Defense Counsel: "There were no vacancies for a Sous Chef for which he was qualified identified at the time."). *But cf.* Dkt. 43 at 13 ("The reason [for Dyer's termination] was not . . . because of 'the lack of an appropriate opening at the time of the [D.C.] Grill's closing.'") (quoting Dkt. 40 at 24); *id.* at 15 n.12 ("Whether other 'chef' positions existed [at the time of the D.C. Grill's closing] . . . is altogether irrelevant."). Lofton's testimony, however, was far more equivocal than M&S/Landry's suggests. Lofton stated that M&S/Landry's was "not able to find [Dyer] a job," but he then went on to assert he "vaguely" recalled talking to Dyer about a position in Baltimore, which Lofton did not "think . . . was doable because of where [Dyer] lived." Dkt. 37-24 at 15–16 (Lofton Dep. 152:19–153:4).

---

[26] M&S/Landry's responds by arguing that, because Dyer was an "at-will" employee, M&S/Landry's had "no duty to transfer him to another location." Dkt. 43 at 13. But that rule, although true as a general matter, does not resolve the question here because M&S/Landry's is alleged to have discharged Dyer instead of transferring him *because* of Dyer's race and *because* he had engaged in protected EEO activity. *See* D.C. Code § 2-1402.11(a)(1). And M&S/Landry's nowhere argues that its decision to discharge Dyer rather than transfer him was not an adverse employment action.

Later in that same deposition, Lofton was even less confident of what had transpired, testifying that it was his "recollection [that] there was nothing open within [Lofton's] restaurant authority," and that, if something had been available, the company "would have, more than likely" transferred him. Dkt. 40-8 at 14 (Lofton Dep. 148:2–14). He then immediately added: "or not. I don't remember." *Id.* That is hardly the type of evidence that would require that a reasonable jury find that M&S/Landry's "had no choice but to terminate [Dyer]'s employment." Dkt. 37-2 at 17 (M&S/Landry's SUMF ¶ 34).

More importantly, M&S/Landry's has not explained why it was able to transfer Guzman to Reston as a Sous Chef, but could not have done the same for Dyer. True, Guzman had originally been hired into the "Manager in Training" program, as M&S/Landry's points out in its brief. *See id.* at 32. But M&S/Landry's offers no evidence that Guzman was still in that program as of May 2013, or evidence that the program gave him unique transfer opportunities unavailable to Dyer. *See supra* Part I.B. To the contrary, a reasonable jury might infer that Guzman's status as a trainee made him *less* suitable for transfer than Dyer, who had held the job for seven years. Nor does M&S/Landry's identify evidence that Guzman's prior tenure at the Reston restaurant somehow "reserved" that space for Guzman, rendering Dyer ineligible for it. *See* Oral Arg. Tr. (Rough at 30–31, 71) (02:54–02:55, 04:23). Although one could imagine that Lofton selected Guzman over Dyer because he deemed Guzman a better candidate, that is not what Lofton claims to have done, and it is not what M&S/Landry's argues he did.[27] Instead, the

---

[27] Although the email from Mamadou Diallo seems to suggest that Landry's declined to transfer Dyer because it deemed him a poor candidate, *see* Dkt. 41-4 at 4, Dyer has not pressed that argument here. When the Court made this point at oral argument, moreover, M&S/Landry's objected that the "Mamadou email" constitutes inadmissible hearsay, *see* Oral Arg. Tr. (Rough at 34) (03:00), which seems to the Court to be correct. The Court therefore does not consider the "Mamadou email" for this purpose.

argument M&S/Landry's does provide—that there simply were no openings for a Sous Chef like Dyer—is sufficiently controverted that a jury could disbelieve it.

So a reasonable jury could find that the stated reason for Dyer's discharge "was not the actual reason." *Brady*, 520 F.3d at 495. The more difficult question is whether that is enough to permit the inference that the true reason was improper. The cases on this issue answer with unanimity: it depends. *See Aka*, 156 F.3d at 1294 ("[I]t is difficult, if not impossible, to say in any concise or generic way under what precise circumstances such an inference will be inappropriate."); *see also, e.g.*, *Reeves*, 530 U.S. at 147–49; *Colbert v. Tapella*, 649 F.3d 756, 759 (D.C. Cir. 2011); *Murray v. Gilmore*, 406 F.3d 708, 714–16 (D.C. Cir. 2005). Although fact dependent, *Walker*, 798 F.3d at 1092, the inference from a finding of pretext to a finding of unlawful intent is strongest "[i]f the jury can infer that the employer's explanation is not only a mistaken one in terms of the facts, but a lie," *Aka*, 156 F.3d at 1293. And the inference is weakest "if the record conclusively revealed some other, non[-]discriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Reeves*, 530 U.S. at 148. At the end of the day, however, rebutting the employer's stated reason will "usually . . . be enough to get a plaintiff's claim to a jury." *Jones v. Bernanke*, 557 F.3d 670, 679 (D.C. Cir. 2009) (alteration removed).

As to Dyer's discriminatory termination claim, this question is a close one. On the one hand, Dyer has adduced no evidence suggestive of racial discrimination (apart from the fact that Guzman is Hispanic while Dyer is black). *See* Dkt. 37-2 at 32–33; Dkt. 40 at 24–29. But, on the other hand, a reasonable jury could find that M&S/Landry's contention that it had "no choice but to terminate" Dyer is not only incorrect, but knowingly false. Given M&S/Landry's efforts to

find positions for the other managers remaining at the D.C. Grill, the company's contention that it terminated Dyer simply because the D.C. Grill closed could ring hollow with the jury. And the company's contention that no spot was available to which Dyer could have been transferred might ring equally hollow in light of the company's decision to transfer a Sous Chef with far less tenure to a vacant position. If a more plausible explanation existed, moreover, one might expect M&S/Landry's to have raised it. Thus, although far from a foregone conclusion, the Court concludes that a reasonable jury could find that the true motivation was unlawful animus. *See Aka*, 156 F.3d at 1293 ("The jury can conclude that an employer who fabricates a false explanation has something to hide; that 'something' may well be discriminatory intent."); *see also Colbert*, 649 F.3d at 378 (reversing grant of summary judgment because "[the defendant's] proffered non-discriminatory reason appear[ed] to be unfounded"); *Murray*, 406 F.3d at 715–16 (reversing grant of summary judgment because "'the proof that the employer's explanation is false' was strong") (citation omitted) (quoting *Reeves*, 530 U.S. at 149).

As to Dyer's retaliation claim, the question is less close. Not only does the above reasoning apply with equal force to the retaliation claim, but that claim also benefits from evidence of close temporal proximity. *See* Dkt. 40 at 28–29. Dyer filed an EEO complaint against M&S/Landry's on April 30, 2013. Dkt. 37-18 at 4. And Lofton decided to terminate his employment less than a week or two later, "[i]n early May 2013." Dkt. 37-2 at 15 (M&S/Landry's SUMF ¶ 30). Temporal proximity of this type, while not typically dispositive at this stage of the analysis, can still support an inference of retaliatory intent, *Jones*, 557 F.3d at 679—particularly when, as here, it is paired with strong evidence rebutting the proffered non-retaliatory rationale.

The Court will, accordingly, **DENY** the motion for summary judgment as to Count III.

C.    **Post-Termination Claims**

The remaining counts of Dyer's complaint allege that the defendants retaliated against him following his dismissal from the D.C. Grill, in violation of the DCHRA. Specifically, Count IV alleges that M&S/Landry's sent Gordon Biersch a false and retaliatory job reference. *See* Dkt. 12-1 at 9–10 (Am. Compl. ¶¶ 48–53). And Count V alleges that Gordon Biersch withdrew its offer to Dyer in retaliation for his prior EEO complaints again M&S/Landry's. *See id.* at 10–11 (Am. Compl. ¶¶ 54–58). The Court will take the two counts in reverse order, and will grant the motions for summary judgment as to both.

1.    *Retaliatory Withdrawal of Job Offer (against Gordon Biersch)*

Dyer's claim against Gordon Biersch requires little discussion. "An employer cannot retaliate against an employee unless the employer has knowledge of the protected activity, and in order to survive summary judgment, an employee must [at least] 'offer circumstantial evidence that could reasonably support an inference that they did.'" *Gray v. Foxx*, 637 F. App'x 603, 607 (D.C. Cir. 2015) (quoting *Jones*, 557 F.3d at 679). Yet, even accepting Dyer's version of events, drawing every reasonable inference in his favor, and assuming that all of Dyer's testimony is admissible, Dyer has adduced no evidence from which a reasonable jury could find that Brett, Forgette, or Spare—the alleged Gordon Biersch decisionmakers—knew about Dyer's prior EEO complaints against M&S/Landry's. To the contrary, the only evidence before the Court cuts the other way. Dyer attests that he never informed Brett, Forgette, or Spare about his EEO activity. Dkt. 38-6 at 5–7 (Dyer Dep. 39:6–41:2). Brett's testimony confirms that he never knew about it. Dkt. 37-33 at 9 (Brett Dep. 160:16–19). Forgette apparently has not testified one way or the other about his knowledge of Dyer's complaints. And Spare was not deposed. *See* Dkt. 46 at 1.

Dyer, instead, attempts to prove Gordon Biersch's knowledge by relying on his own testimony regarding the anonymous email that Gordon Biersch supposedly received, which

purportedly described Dyer as a "troublemaker" or a "problem employee." *See* Dkt. 41 at 8; Oral Arg. Tr. (Rough at 78–80) (04:33–04:38); *see supra* Part I.C.3. But, even assuming for present proposes that this testimony is both true and admissible, it is still insufficient to permit a reasonable jury to find that Gordon Biersch knew about Dyer's EEO complaints. Receiving an anonymous note stating that someone is a "troublemaker" or a "problem employee" could mean any number of things. It could mean that he is consistently late for work, that he ignores instructions, that he is abusive to other employees, that he is dishonest, that he is rude to customers, that he cuts corners, or—conceivably—that he has accused his past employer of discrimination. Absent *some* additional evidence, there is simply no basis for a reasonable jury to find that of the innumerable possibilities, Gordon Biersch so understood this cryptic comment. And, although Dyer does point to additional evidence regarding purported contacts between Gordon Biersch and M&S/Landry's employees, none of that evidence (even if admissible) would allow a reasonable jury to find that Gordon Biersch was aware of Dyer's EEO activity.

This flaw in Dyer's claim is all the more substantial because this is not a case in which an employee contends that his employer retaliated against him because the employee filed an EEO complaint against the employer. There is no basis to infer that Gordon Biersch was aware of Dyer's EEO activity. Rather, the only way that Gordon Biersch would have known about Dyer's EEO complaints would have been if Dyer told Gordon Biersch or if someone associated with the EEO proceedings had done so. The undisputed evidence, however, forecloses the first path, and no meaningful evidence supports the latter. Indeed, asked at oral argument to justify Dyer's argument with any citation to case law, his attorneys came up short. *See* Oral Arg. Tr. (Rough at 79–80) (04:37) ("Your Honor, specifically on the word 'troublemaker,' I'm unaware if the word troublemaker on its own is enough to impute knowledge of protected activity."). Dyer has

therefore failed to rebut Gordon Biersch's argument that "there is no evidence that a relevant decisionmaker [at Gordon Biersch] was aware that . . . Dyer had complained . . . [of] discriminatory employment practices."  Dkt. 38-1 at 6; *see also* Dkt. 42 at 5–8.  This defect is fatal to Dyer's claim against Gordon Biersch.  *See, e.g.*, *Morris*, 825 F.3d at 673; *Gray*, 637 F. App'x at 607; *Jones*, 557 F.3d at 679.

As a final effort, Dyer argues that he has adduced evidence from which a reasonable jury could find that Gordon Biersch's stated reason for withdrawing the offer—*i.e.*, that Dyer misrepresented his employment history—was "not the [real] reason" for its decision.  *See* Dkt. 41 at 14–15.  Much of the evidence he cites is inadmissible.  But even if it was admissible, evidence like the email from Gordon Biersch Chef Mamadou Diallo to Forgette regarding an unidentified source at M&S/Landry's would not permit a reasonable jury to find that Gordon Biersch knew about Dyer's EEO activity.  Dyer, accordingly, cannot overcome the self-evident rule that "[a]n employer cannot retaliate against an employee unless the employer has knowledge of the protected activity."  *Gray*, 637 F. App'x at 607.  To survive summary judgment, "[t]he evidence of record must be such that a reasonable jury could not only disbelieve the employer's reason[], but conclude that the real reason the employer took a challenged action was a prohibited one."  *Walker*, 798 F.3d at 1093.  In this context, that means that Dyer can only "survive summary judgment" by offering evidence—circumstantial or direct—that "could reasonably support an inference that" his employer had "knowledge of [the employee's] protected activity."  *Gray*, 637 F. App'x at 607.  Because Dyer has failed to identify any such evidence, no reasonable jury could find in his favor.  *See, e.g.*, *Morris*, 825 F.3d at 673; *Gray*, 637 F. App'x at 607; *Jones*, 557 F.3d at 679.

The Court will, accordingly, **GRANT** the motion for summary judgment as to Count V.

2.    *Retaliatory Job Reference (against M&S/Landry's)*

Dyer's post-termination retaliation claim against M&S/Landry's raises a different set of issues.  In essence, Dyer contends that managers at M&S/Landry's sent recruiters at Gordon Biersch one or more negative employment references about Dyer as part of a deliberate effort to retaliate against him for his prior EEO complaints.  *See* Dkt. 41 at 1–2.  Unlike with Gordon Biersch decisionmakers, there is no question that managers at M&S/Landry's were familiar with Dyer's EEO history.  As a result, the pertinent question here is whether any admissible evidence shows that M&S/Landry's gave Dyer a negative job reference.

a.    The Anonymous Email

The most direct evidence of a negative job recommendation from M&S/Landry's consists of the sworn statements from Dyer and his fiancée recounting what Spencer and Forgette told them about the anonymous email, which supposedly called Dyer a "problem employee" or a "troublemaker."  *See supra* Part I.C.3.  The Court, of course, must take Dyer and his fiancée at their word.  *See United States v. Seventeen Thousand Nine Hundred Dollars ($17,900.00) in U.S. Currency*, 859 F.3d 1085, 1092 (D.C. Cir. 2017) ("[I]t bears repeating that '[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge,' and are thus inappropriate at summary judgment.") (alteration in original) (quoting *Liberty Lobby*, 477 U.S. at 255).  But the Court may not consider their testimony if it is both objected to and inadmissible.  *See* Fed. R. Civ. P. 56(c)(2).  Here, M&S/Landry's objects that Spencer and Forgette's descriptions constitute inadmissible hearsay, Dkt. 37-2 at 36, and, as explained below, the Court agrees.

Generally speaking, "hearsay" is an out-of-court statement offered to prove the truth of the matter asserted.  *See* Fed. R. Evid. 801(c).  Absent an exception, hearsay is inadmissible. Fed. R. Evid. 802.  But certain categories of statements fitting this general definition are

expressly defined as *not* hearsay—including "an opposing party's statement." Fed. R. Evid. 801(d)(2). As relevant here, an opposing party's statement is not hearsay if it "is offered against the opposing party" and either "(D) was made by the party's agent or employee on a matter within the scope that relationship and while it existed" or "(E) was made by the party's coconspirator during and in furtherance of the conspiracy." *Id.* Such statements are admissible as "the result of the adversary system," Fed. R. Evid. 801(d)(2) note, because "the party himself is present and can explain, deny, or rebut any such statement," 4 Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 8:44 (4th ed. updated June 2017).

The statements attributed to Spencer and Forgette involve several layers of potential hearsay, each one of which Dyer must show not to be hearsay or to fall within a hearsay exception. *See* Fed. R. Evid. 805. As to Spencer's statement, Dyer and his fiancée can testify that (1) Spencer said that (2) Forgette said that (3) an anonymous email said negative things about Dyer. And as to Forgette's statement, Dyer and his fiancée can testify that (1) a person they understood to be Forgette said that (2) an anonymous email said negative things about Dyer. One common element is the statement attributed to Forgette, so the Court will focus its analysis there. Dyer argues that Forgette's statement is admissible against M&S/Landry's under both Rule 801(d)(2)(D) and 801(d)(2)(E). *See* Dkt. 41 at 11–13. The Court, however, is unpersuaded.

Rule 801(d)(2)(D) is no help because Forgette was not the "agent or employee" of M&S/Landry's; he was the employee of Gordon Biersch. So although Forgette's statement might be admissible under this rule against *Gordon Biersch*, the same logic does not apply to M&S/Landry's. Rule 801(d)(2) requires that the statement be "offered against" the party who made or authorized it. It follows that "[one] party's statements may not be admitted under this

rule against another party on the same side of the litigation." 5 Mark S. Bordin *et al.*, *Weinstein's Federal Evidence* § 801.30[1] & n.5 (2d ed. 2017); *accord* 4 Mueller & Kirkpatrick, *supra*, § 8:44 & n.5; *see, e.g.*, *Agere Sys., Inc. v. Advanced Envtl. Tech. Corp.*, 602 F.3d 204, 232 (3d Cir. 2010) (statement signed by Defendant X but not Defendant Y admissible as against X but not Y); *Stalbosky v. Belew*, 205 F.3d 890, 894 (6th Cir. 2000) (statement by Defendant B not admissible against Defendant T because, "[u]nder Rule 801(d)(2)(A), a party's statement is admissible as non-hearsay only if it is offered against that party"). Because Forgette was not an employee or agent of M&S/Landry's, Rule 801(d)(2)(D) cannot do the work Dyer asks of it.

Nor has Dyer shown that Rule 801(d)(2)(E)'s exception for coconspirator statements applies. Before Dyer can invoke that rule, "[t]here must be evidence that there was a conspiracy involving the declarant and the non-offering party, and that the statement was made 'during the course and in furtherance of the conspiracy.'" *Bourjaily v. United States*, 483 U.S. 171, 175 (1987) (quoting Fed. R. Evid. 801(d)(2)(E)). The D.C. Circuit "requires that there be independent evidence of the conspiracy apart from the statement" at issue. *United States v. Gatling*, 96 F.3d 1511, 1520 (D.C. Cir. 1996). The conspiracy, however, need not be unlawful. Rather, it is sufficient that the individuals be "acting in furtherance of a lawful joint enterprise," *United States v. Brockenborrugh*, 575 F.3d 726, 735 (D.C. Cir. 2009) (citing *United States v. Gewin*, 471 F.3d 197, 201–02 (D.C. Cir. 2006)), and in service of "a common goal," *United States v. Weisz*, 718 F.2d 413, 433 (D.C. Cir. 1983).

Dyer points to no evidence suggesting that Gordon Biersch and M&S/Landry's shared a common agreement, enterprise, plan, or goal. *See* Dkt. 41 at 12–13. Instead, he relies primarily on the email from Diallo, in which Diallo advised Forgette that an unidentified source at M&S/Landry's stated that he would not have hired Dyer. *See id.*; *supra* Part I.C.2. The Diallo

email, however, is also inadmissible: Dyer has not sought to and, as far as the Court can tell, could not invoke any hearsay exceptions to admit either the statements of Diallo or, indirectly, the statements of the unidentified M&S/Landry's employee that Diallo described. And, even if the email were admissible, it is unclear how it would constitute evidence of a conspiracy; at best, it would show that one unnamed M&S/Landry's employee considered Dyer an undesirable employee. Dyer also points to the July 10, 2013, email from Brett to Spencer that stated, "It is getting weirder and more strange by the minute." *See* Dkt. 41 at 13; *supra* Part I.C.2. But even the most generous interpretation of this email does not constitute evidence of a conspiracy between Gordon Biersch and M&S/Landry's. The email was not addressed to M&S/Landry's, and its single, cryptic sentence does not refer to M&S/Landry's at all. Dyer's cursory attempt to invoke Rule 801(d)(2)(E)'s exception for coconspirator statements is therefore a nonstarter.

The Court, accordingly, concludes that Forgette's description of the anonymous email— and Spencer's description of Forgette's description of the anonymous email—is inadmissible hearsay for purposes of Count IV. Because Dyer has adduced no other evidence of the anonymous email, the Court will not consider it in evaluating the motion for summary judgment on that count.[28]

### b. Other Communications Between M&S/Landry's and Gordon Biersch

For completeness's sake, the Court also notes that none of the other "communications" between Gordon Biersch and M&S/Landry's that Dyer has identified constitute "negative employment references" from M&S/Landry's that could serve as foundations for Count IV of

---

[28] M&S/Landry's further argues that, even if the anonymous email were admissible, there is no evidence that it was sent by an M&S/Landry's employee. *See* Dkt. 37-2 at 35 n.21 (M&S/Landry's argument). *But see* Dkt. 41 at 8 (Dyer's counterargument). The Court need not address this issue.

Dyer's complaint. *See* Dkt. 41 at 5–6 (Dyer's brief) (listing such "communications"); *see also supra* Part I.C.2 (same). *First*, Forgette's testimony regarding the phone call from Spare, in which Spare described his conversation with an unidentified M&S/Landry's employee, is inadmissible. Spare's statement is an out-of-court statement offered for its truth, and Spare (like Forgette) is not an opposing party for purposes of Count IV and Federal Rule of Evidence 801(d)(2). *See supra* Part III.C.2.b. Even if admitted, moreover, the statement from the unknown M&S/Landry's employee cannot on the present record be attributed to the company as an entity. The statement, in addition, merely informed Spare that Dyer no longer worked at M&S/Landry's, and cannot reasonably be construed as a "false" or "negative" employment reference. *Second*, the July 10, 2013, email from Brett to Spencer describing how things were "getting weird and more strange by the minute" is devoid of any relevant content. *See supra* Part III.C.2.b. And, *third*, the email describing Forgette's conversation with Diallo appears both inadmissible, *see id.*, and irrelevant. The statements of Diallo's "source" inside M&S/Landry's cannot be attributed to M&S/Landry's as an entity, given that the parties adduce no evidence regarding the identity of the source. *See supra* Part I.C.2.

Dyer has therefore adduced no admissible evidence of any "negative employment reference" that could serve as a basis for Count IV. The Court, accordingly, will grant the motion for summary judgment on that count.

## CONCLUSION

For the reasons stated above, the motion for summary judgment filed by M&S and Landry's (Dkt. 37) is hereby **GRANTED** with respect to Counts I, II, and IV, and **DENIED** with respect to Count III.  In addition, the motion for summary judgment filed by Gordon Biersch (Dkt. 38) is hereby **GRANTED** in its entirety (*i.e.*, with respect to Count V).

**SO ORDERED.**


/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  September 3, 2017